33 A.3d 494

**STATE of Maryland**

v.

**Konnyack A. THOMAS.**

**No. 1242, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Dec. 21, 2011.

548

Carrie J. Williams (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellant.

Ben Miller (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellee.

Panel: MEREDITH, GRAEFF and WATTS, JJ.

GRAEFF, J.

This appeal involves the State's challenge to the ruling of the Circuit Court for Montgomery County suppressing a statement that Konnyack Thomas, appellee, made to the police. The appeal was brought by the State pursuant to Md.Code (2006 Repl.Vol.) § 12–302(c)(3)(i) of the Courts & Judicial Proceedings Article ("C.J.P."), which requires us to render our decision within 120 days of the filing of the record in this Court. The record was filed on September 6, 2011; therefore, our decision must be rendered by January 4, 2012.

Two issues have been presented for our review,[1] which we have rephrased as follows:

1. Did the circuit court err in granting appellee's motion to suppress the statement he made to the police on the ground that appellee was in custody when he made the statement and was not given *Miranda*[2] warnings?

2. Should appellee's statements be suppressed because they were made in reliance on a promise to help his daughter, rendering the statements involuntary pursuant to Maryland law?

For the reasons set forth below, we shall reverse the judgment of the circuit court on the custody issue. We will

---

**1.** The State presents the following question for review:

Did the lower court err in granting Thomas's motion to suppress the statement he made to police where the court: 1) erroneously placed the burden on the State to prove that Thomas was not in custody; 2) wrongly found the essential question to be whether a reasonable person in Thomas's shoes would feel free to leave, and then found that no reasonable person would ever feel free to leave an interview occurring in a police station; 3) relied on the detectives' subjective intent to gather evidence and "build a case" when evaluating *Miranda* custody; and 4) held that a suspect is in *Miranda* custody the moment he or she utters an incriminating statement regardless of whether any of the objective circumstances of the interrogation have changed?

Appellee raises an additional issue in his appeal, arguing that "[his] statements should be suppressed because they were involuntary."

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

not review the claim regarding the voluntariness of the statements based on the record before us.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 1, 2010, appellee was charged by indictment with one count of sexually abusing a minor, two counts of second degree rape, and six counts of second degree sexual offense. On June 28, 2011, the Circuit Court for Montgomery County held a hearing on appellee's motion to suppress his statements to the police, which defense counsel explained was "based on the failure to give *Miranda* and based on there being inducements by the police." Defense counsel introduced into evidence, as Defense Exhibit 1, a transcript of appellee's August 31, 2010, statement to the police. Detective Kristie Thorpe, a member of the Montgomery County Police Department, Family Crimes Division, and appellee testified at the hearing.

Appellee, a sergeant in the United States Army, testified that a detective contacted him on August 31, 2010, and asked: "[C]an I come down to the station, it has to do with one of my children." Appellee agreed and drove himself to the police station. He initially believed that he was going to the station to discuss a problem with his teenage stepson, who recently had run away from home. While driving to the station, however, appellee spoke with his wife on his cell phone. She told him that she and his then 14–year–old daughter, C., had told the police that appellee had sexually abused C.[3]

Appellee arrived at the police station approximately one hour after he received the detective's call. Detective Thorpe and Detective Errol Birch, who both were unarmed and dressed in plain clothes, met appellee in the station lobby. The officers asked appellee to speak with them and led him to a child interview room. They went through a locked door that requires an access card to open, and once through that door, "the interview rooms are right there." There was no discus-

---

**3.** In order to protect the identity of the victim, we will refer to her only by the first initial of her first name.

sion, other than small talk or "introductions," before entering the interview room.

Detective Thorpe described the interview room as "a small room," with "teddy bears along the wall [in] a bookcase . . . [a] couch in the center and . . . two chairs that are on both sides of the door." Appellee sat on the couch, and the officers sat on the two chairs, between appellee and the door. Detective Thorpe initially testified that she told appellee that the door was unlocked, and he could leave if he wanted to leave. After reviewing a transcript of the interview, Detective Thorpe testified that she did not tell appellee that he could leave, but she told him that he was not under arrest and the door was not locked.

Appellee appeared to understand everything that she was saying. The interview lasted approximately an hour and a half, and appellee never said that he did not want to speak to the officers or that he wanted to exit the room. Detective Thorpe testified that she did not make any threats or promises "about giving him things or . . . something [would] go easier for him if he talked to" her.

When Detective Thorpe began talking with appellee that night, she did not intend to place him under arrest. Her intentions changed "[t]oward the end of the interview when [she] asked [appellee] how was he feeling and how was he coping with things and he made statements indicating he wasn't doing well and he wasn't coping well," at which point she "became concerned about his safety."

Appellee testified that, during the interview, he believed "that I wasn't leaving that place, that I was there, you know, to be arrested for these accusations." Appellee's counsel then referred to a portion of the transcript, which counsel characterized as "the detective said that you should talk to them so they could take care of [C.], that she needed some help." Counsel then quoted from the transcript where Detective Thorpe said: "Right now we want to get [C.] any type of services she can get that will assist her in getting through this." Appellee responded in the affirmative when counsel asked: "Do you recall that the detective said that she would

speak to the Army regarding your cooperation with them and in getting continued support for the family?" Appellee testified that he relied on "the promises to, that the officers would speak to the Army," stating: "[T]hem sitting there saying that my daughter needed assistance, my daughter needs help, I just told them what, what they, I guess they wanted to hear . . . in order to help my daughter."

On cross-examination, appellee admitted that the detectives never raised their voices during the interview. The following colloquy then occurred:

[Prosecutor]: On the phone with Detective Thomas, she never promised you that if you came in and talked to them things would go easy for you, right?

[Appellee]: No.

[Prosecutor]: And she never told you if you came in and talked to them, you would never be arrested?

[Appellee]: No.

[Prosecutor]: And she never told you if you came in and talked to them, then your daughter would get services?

[Appellee]: No.

[Prosecutor]: Okay. And Detective Thorpe and Detective Birch, they never had any kinds of conversations with you out in the lobby area about any of that, right?

[Appellee]: No.

The court then asked appellee: "What did you think was going to happen after you went into the interview room?" Appellee responded: "I was assuming that I was going to be arrested for these accusations." When asked when he began to believe that, appellee responded: "After my conversation with my wife." The court asked if appellee felt that he "could just get up and walk out." Appellee responded: "No, I did not, Your Honor."

Defense counsel argued that appellee was in custody during the interview, which required that the police advise him regarding his *Miranda* rights. He asserted that a reasonable person would not have felt free to leave under the circumstances, *i.e.*, where he had been accused of molesting his

daughter, and he was placed in a closed room with two detectives, after being led through a locked door which required a key card.

The court, referencing the transcript of the interview, asked the State why *Miranda* warnings were not given "after Page 10," when appellee admitted to engaging in vaginal intercourse with his daughter. The court stated that, "up to Page 10 it's good detective work," but it questioned whether, once appellee admitted he "had sex with a minor," he was free to leave.

The State noted that the police advised appellee that, although he might be arrested "at some point," he was "not going to go to jail tonight."[4] It pointed out that appellee was left alone to write a letter to his daughter, and he was permitted to use the restroom by himself while the police were out of the room. The prosecutor asserted that a review of the videotape would be helpful, as opposed to merely reading the transcript, because the words "do not accurately convey the feeling in the room," which the prosecutor characterized as "like a confessional," with appellee "decid[ing] to unburden himself."

---

4. The portion of the transcript to which the prosecutor referred shows the following:

[Appellee]: I guess what I'm asking is—you said I'm not under arrest?
Detective Thorpe: That's correct.
[Appellee]: But this is an investigation?
Detective Thorpe: Correct.
[Appellee]: I guess I just want to be straight up. I'm going to jail, aren't I?
Detective Thorpe: I don't like to lie to people, so what I will tell you is that **you're not going to jail tonight.** Is there a possibility that you will in the near future? There is a possibility. If you want to know what the next step in my investigation is—
[Appellee]: Yes.
Detective Thorpe: Okay, the next step is, **after we finish meeting with you** and after you have your time to write your letter to [C.], he and I will step out and we'll discuss your case. **We have other people to talk to about your case.** And then, **once that's done, I'll be in touch with you.**

(Emphasis added). The prosecutor argued that this conversation showed that the intent was for appellee to leave that night.

The court then asked the State to address the parts of the transcript where the detective said they "just want to help [C.]." The State argued that the officer's statements were "in response to a direct question by the defendant." The State quoted from the transcript, noting appellee's concern about "the next step," and "that [C.] is safe and that she's taken care of . . . financially." The prosecutor quoted Detective Thorpe's statement: "Your first question was about your family. Right now we want to get [C.] any type of services that she can have," and she argued that the statement about services for C. was "in direct response to the defendant's inquiry about what happens next."

Defense counsel then presented his argument that the statement was involuntary. He argued that appellee's statements were inadmissible because they were the product of a promise to assist appellee's daughter.

The prosecutor then played the video recording of the interview.[5] The two detectives began speaking with appellee at approximately 7:14 p.m. The interview began with Detective Thorpe saying: "Sit on the couch. Thank you for coming in. It looks like we caught you coming in from work."[6] The detectives then asked about appellee's name, address, telephone numbers, and date of employment. The following then took place:

> Detective Thorpe: Okay. Do you have any idea why you're here today?
>
> [Appellee]: I know why I'm here.
>
> Detective Thorpe: Okay. Well, again, I want to make sure you understand. This may not look like a police facility, but

---

5. As indicated, defense counsel introduced into evidence, as Defense Exhibit 1, a transcript of the entire interview. There are some discrepancies between the transcript of the interview submitted into evidence by the defense and the certified transcript of the suppression hearing. We will refer to the transcript that appears to best reflect what occurred, noting any significant differences.

6. The hearing transcript provides: "You can sit on the couch."

it is a police station. You're not under arrest or anything like that, okay? This door is not locked. I'll leave it open. And if I could reach it, I would open it for you.[7] But the door is unlocked, okay? So I just want to make sure you understand that. So why are you here?

[Appellee]: It has to do with my daughter.[8]

Detective Thorpe asked: "Okay. And what about her?" Appellee stated that it was "kind of hard to talk about." Detective Thorpe then stated:

Okay. You're correct. I invited you to come in because of some things, something going on with your daughter. And let me tell you a little bit about what we do and maybe it will help you speaking with us.

All we do here all day is talk about some very personal, private things that we normally don't talk about outside the office here, okay? And you aren't the first person to come in here and talk to us. You might not even be the last one here tonight. Okay?

Now what I can say is it looks like it's been weighing on you. You look like you've been crying and having a horrible time.

Appellee responded: "I have."

The following then occurred:

---

7. Detective Thorpe testified that the way her chair was positioned, she could not reach the door to demonstrate that it was unlocked.

8. The hearing transcript provides:
 [Detective Thorpe]: Okay. Do you have any idea why you're here today?
 [Appellee]: (Unintelligible.)
 [Detective Thorpe]: Okay. Well, again, I want to make sure you understand, and this may not look like a police facility, but it is a police station. You're not under arrest or anything like that, okay? This door is (unintelligible) locked. I'd leave it open and if I could reach it, I would open it for you. I'm vertically challenged, but the door is unlocked, okay?
 [Appellee]: Uh-huh
 [Detective Thorpe]: So I just want to make sure you understand that. Okay? So why are you here?
 [Appellee]: It has to do with my daughter.

[Detective Thorpe]: That says a lot. Because at least you—you know, you have a kind heart where your conscience is guiding you to do the right thing. I did speak with [C.] And she told me about some things had been going on for quite some time between you and her. You want me to tell you what she told me?

[Appellee]: I've been, I've been touching her.[9]

[Detective Thorpe]: When did it start?

Detective Thorpe then asked appellee questions about when the touching started and asked appellee to clarify what he meant by "touching." Appellee stated that the "incidents" began when he was living in Georgia, stating that he touched his daughter on her "[p]rivate areas," including her vagina and breasts, both over and under her clothing.

Detective Birch stated: "Now I know it's difficult for you to talk about it, but I'm going to give you all the credit in the world to talk about the hardest thing possible in front of two strangers. What happened after the touching?"[10] Appellee stated: "I know where this is going." Detective Birch then stated:

Let me tell you what our job is, okay, before you—as you're thinking. Your daughter has come to talk to us about things that happened to her. Sadly enough, she blames herself for everything and that's a terrible thing that occurs, all right?

She loves you. She cares about you. But she blames herself because she understands what's going on. Less important to her, and she expressed it, it is the only way she can get through this is to get reassurance that it wasn't her

---

9. Defense Exhibit 1 provides: "Yeah. I've been telling—." The certified transcript of the hearing makes more sense in light of Detective Thorpe's subsequent comments. The parties agree with this assessment.

10. The last sentence, "What happened after the touching?" does not appear in Defense Exhibit 1.

fault. When she gets into therapy, she has to know it's not her fault.

[Appellee]: I've told her that.

[Detective Birch]: And you know what? I'm sure you have. But she had the guts and the strength to sit here and tell us things that happened to her that are very difficult. And I'm asking you to have the same strength and to help us take care of her. Okay?

You're going to have the opportunity down the road, but we just need to hear it from you, what occurred, so we can get her the help she needs. And that's going to be therapy, okay?

Detective Birch suggested that "it's easier to remember the last thing that happened ... [t]he last thing that happened was up here in Montgomery County, correct?" Appellee stated that the last incident occurred in June or July of 2010 when he and his daughter were home alone. Detective Thorpe asked him: "And what happened that last time?" Appellee responded: "Sex." Appellee clarified, in response to Detective Thorpe's questions, that it was vaginal intercourse. It occurred in his bedroom, and he had locked the door. He did not wear a condom, nor did he ejaculate. He stated that he had engaged in both fellatio and cunnilingus with C. in Montgomery County on prior occasions. Detective Birch asked: "In the last event, how did you lure her to the room? Did you say, 'Come into the room' and she knew what was going on?" Appellee responded: "Yeah."

At this point, the suppression judge paused the recording and stated that he had heard enough to make a decision and did not need to hear the remainder of the interview. The court heard argument from the parties and issued its ruling. The court stated:

I'm probably, other than the deputies, the only one in this courtroom who has any notion of what it's like to be sitting in an interrogation room interrogating people. And I will just say that I never saw, I never had in all of my experi-

ence, I never had any suspect get up and walk out of the interrogation room or even think that he could.

And so the Supreme Court has set forth the standard and it is a reasonable person standard. Does a reasonable person in a police station think that he or she can just get up and walk out? No one has cited a case where that's what happened, where a person just got up and walked out. The case wouldn't be here on that issue. It probably would be here on the issue of what happened when they attempted to do that.

\* \* \*

Now it's relevant in this case that the defendant, Mr. Thomas, is a sergeant in the United States Army. I think it's a reasonable inference that if the police want to talk to you about your children, and particularly when he finds out that it's about his daughter, that a sergeant who is a supervisor in the United States Armed Forces does not want police detectives coming on the base to talk to him about sexually abusing his daughter. I think it's a reasonable inference.

So, certainly, he was going to go down to the police station to talk to them, as opposed to having them come to him.

Now, he gets to the police station and the detective tells him the following things. They greet him and they tell him it is a police station. It "doesn't look like" one, but it's a police station.

They tell him, "You are not under arrest," and that the door is unlocked. Now what does that mean? . . .

If he was free to leave and he could get up and walk out if he wanted to, why didn't they just say that? Why stop by telling him, after telling him the door is unlocked?

The court found that, throughout the interview, the officers were "polite," "courteous," and "respectful," but it stated that, "being interviewed by the police, and particularly in a police

station," is inherently coercive. The court recognized, however, that it needed to consider the totality of the circumstances.

The court continued:

> The Court does not find that there was any intention by the detectives to do anything improper. However, a system of subterfuge has developed in the law enforcement community with respect to interrogation techniques.
>
> The defendant was not at the station for a social visit. The detectives wanted to make this prosecution. They told the defendant he was not under arrest and the door was unlocked. It's a scary thought to think that in this community a citizen can walk into a police station, confess to a violent crime and then they are free to leave.
>
> The State argues that a man who goes in and says that I was, I sexually abused my daughter can just leave. And that flies in the face of reason that you could go in and confess to a murder and just walk out of the station, you're not under arrest and you're not, and you're not in custody.
>
> Now interrogations in police stations are inherently custodial whether they are coercively so or whether it's to the extent that it's violative of the requirements of *Miranda* is what these cases are all about. And that's why the Court must consider each factual situation on its own legs.

* * *

> I don't know of any cases, as I said earlier, where a person just gets up and just walks out of a police station or feels that he can. What reasonable person would think that?
>
> Now, the Court considers the facts in this case further as follows. The defendant was being interviewed in the police station. The defendant was in a police interview room with two detectives, notwithstanding the fact that the door was unlocked as the defendant was told. He was also told that he was not under arrest. He was not told that he was free to leave.
>
> The Court also considers that the questions that were being asked were specific not so much as to find out what

happened. These questions weren't to find out what happened, simply to find out what happened. These questions were being asked to gather evidence. That's what the detectives were doing, they were gathering evidence.

What did you do? Where was she touched? When did it start? How many times did you do it? And the argument is that *Miranda* warnings should not have been given?

The court indicated that the State had the burden to prove by a preponderance of the evidence that the questioning did not constitute a custodial interrogation. It characterized the State's argument as suggesting "that the defendant was free to leave and this was just a nice little conversation sitting on a nice, looks like a soft, comfortable sofa sitting back just talking." The court stated, however, that the police "weren't sitting back just talking. They were building a case."

The court continued:

And they weren't trying to find out—This wasn't a whodunit. This was "You did it," and we want to know what you did, when you did it, how many times you did it. Now law enforcement in this case would have been better served if the defendant had been read his *Miranda* rights....

At the end of the day, this query remains, what is wrong with giving people their *Miranda* rights? And I'll tell you what's wrong with it. As soon as defendants are given their *Miranda* warnings, they often lawyer up. And when they lawyer up, they don't get the information that the detectives want to get.

\* \* \*

Now when the officer took the stand, and this was very telling, ... there was some suggestion in the beginning that she told him some certain things that she didn't tell him.

[Defense Counsel] argued that they probably usually tell them that they are to leave, but she didn't do it this time. She just told him that the door was unlocked and why do that? Why say the door is unlocked if he's—why not just say "You're free to go, you're not in custody"?

The court ultimately concluded that appellee was in custody, and he was questioned without receiving *Miranda* warnings. It stated:

This was a custodial interrogation. That no reasonable person would have thought they could get up and walk out of that room after they confessed to committing a violent crime.

That is just completely unreasonable to think that anybody would think they could go into a police station, sit down in an interrogation room, admit a violent crime and they're free to leave.

And I don't think any lawyer in this room really believes that a person can go in a police station and confess to a violent crime and say, "I'll see you later." That just isn't going to happen. It doesn't happen in the real world. And the technique of doing that ought to be stopped and this message is sent. The motion to suppress that statement is granted.

The State informed the court that it would be filing an interlocutory appeal. It asked the court to rule on the issue of voluntariness. Appellee's counsel argued that the issue was moot if the statement was suppressed. The State asserted that it was not moot "because if the State were in a position to go forward in this case . . . [it needed] a ruling on voluntariness." The court declined to rule on the issue of voluntariness, given its ruling on the custody issue.

The State then filed this timely appeal.

## DISCUSSION

The State contends that the suppression court erred when it granted appellee's motion to suppress his statement to the police. It argues that the court was wrong in finding that appellee was in custody at the time of his statements, and therefore, the statements appellee gave in the absence of *Miranda* warnings were inadmissible. The State lists multiple errors that it asserts were committed by the suppression court when it made its ruling, including that the court: (1)

"shifted the burden of proof by requiring the State to prove that [appellee] was not in custody"; (2) applied an incorrect test for determining custody, finding that interrogations that take place inside of a police station are inherently custodial; (3) improperly "considered the detectives' subjective intent"; and (4) found that "a suspect is in *Miranda* custody the moment he or she utters an incriminating statement regardless of whether any of the objective circumstances of the interrogation have changed."

The State argues that, "[w]hen the totality of the circumstances surrounding [appellee's] interview are considered, it is clear [appellee] was never in custody." It notes that appellee "voluntarily traveled to the police station in his own vehicle," Detective Thorpe told appellee that the door to the interview room was not locked and that appellee was not under arrest, the demeanor of the detectives during the interview was "polite, courteous, and respectful," and the interview lasted less than an hour and a half.

Appellee contends that the circuit court properly found that his statements to the police were inadmissible. He makes two contentions in this regard.

First, appellee argues that the court was correct in finding that he was in custody when police interrogated him and, because he was not given *Miranda* warnings, the court properly suppressed his statements. In support of this contention, appellee states that he knew that he had been accused of sexually assaulting his daughter, he was interviewed in a room at the police station, after being led "through a locked, closed door that required an access card to open, a card only the police had," the police closed the door to the interview room and did not advise that he was free to leave, the police questioned appellee in "an accusatory manner," and, shortly after the interrogation ended, he was arrested.[11]

---

11. In his brief, appellee argued that his military career was a factor in the custody determination, suggesting that "the impact of a military career on a person's obedience to authority" was a relevant factor. At oral argument, however, counsel for appellee withdrew this claim,

Second, appellee argues that, even if he was not in custody, his "statements should be suppressed as they were involuntary." He points to the detectives' statements about getting C. "the help she needed," and he argues that "it is clear that appellee's confession was made in reliance on an improper inducement."

## I.

### Custody

■ This Court has explained the standard of review of a circuit court's ruling on a motion to suppress as follows:

[T]his Court looks solely at the record of the suppression hearing, extending great deference to the factual findings of the suppression judge with respect to determinations regarding witness credibility and the weighing of first-level facts. Such determinations will not be disturbed unless clearly erroneous. All facts must be viewed in the light most favorable to the prevailing party on the motion.

Although great deference is given to the trial court in relation to its factual findings, we perform our own independent constitutional appraisal of the law as it applies to the facts of the case.

*Collins v. State*, 192 Md.App. 192, 214–15, 993 A.2d 1175 (2010) (citations and quotations omitted). When the issue on appeal involves custody for *Miranda* purposes, "we accept the factual findings of the court, unless clearly erroneous, but determine *de novo* the constitutional significance of those findings, *i.e.,* whether on the facts as found, the defendant was or was not

conceding, appropriately, that this subjective factor was not an appropriate consideration in the custody analysis. *See Yarborough v. Alvarado*, 541 U.S. 652, 662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (when making a *Miranda* custody determination, an objective test is preferable to a subjective test because it does not " 'place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question' ") (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 n. 35, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

'in custody.'" *Buck v. State,* 181 Md.App. 585, 609, 956 A.2d 884 (2008).

■ The Fifth Amendment to the United States Constitution, which applies to the States pursuant to the Fourteenth Amendment, *Maryland v. Shatzer,* ——— U.S. ———, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045 (2010), provides that "[n]o person ... shall be compelled in a criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court adopted a set of prophylactic measures to protect a suspect from the "inherently compelling pressures" of custodial interrogation. *Shatzer,* 130 S.Ct. at 1219 (quoting *Miranda,* 384 U.S. at 467, 86 S.Ct. 1602). Prior to custodial interrogation, the police must warn a suspect that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602.

■ The Supreme Court has recognized, however, that, although "[a]ny police interview of an individual suspected of a crime has 'coercive aspects to it,'" the *Miranda* requirements apply only to custodial interrogation. *J.D.B. v. North Carolina,* ——— U.S. ———, 131 S.Ct. 2394, 2401–02, 180 L.Ed.2d 310 (2011). Thus, before a defendant can claim the benefit of *Miranda* warnings, the defendant must establish two things: (1) custody; and (2) interrogation. *Smith v. State,* 186 Md. App. 498, 518, 974 A.2d 991 (2009), *aff'd,* 414 Md. 357, 995 A.2d 685 (2010). The burden of "showing the applicability of the *Miranda* requirements," *i.e.,* that there was custody and interrogation, is on the defendant. *Id.* at 520, 974 A.2d 991.

Here, there is no dispute that appellee was subjected to interrogation when he was questioned at the police station for over an hour. The question here is whether he was in custody at the time of the interrogation.

The Supreme Court recently stated that the issue "whether a suspect is 'in custody' is an objective inquiry." *J.D.B.,* 131 S.Ct. at 2402. It explained as follows:

"Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest."

*Id.* (quoting *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)).

At the suppression hearing, the circuit court articulated the relevant test as whether "a reasonable person in a police station think[s] that he or she can just get up and walk out." As indicated, *supra,* this is part of the analysis, but it is not the complete analysis.

As the Second Circuit has explained:

Because seizure is a necessary prerequisite to *Miranda,* see, e.g., *Oregon v. Mathiason,* 429 U.S. [492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) ]; *California v. Beheler,* 463 U.S. [1121, 1123–24, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) ], however, it makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights. On the other hand, if a reasonable person would not have thought himself free to leave, additional analysis is required because, as *Berkemer v. McCarty,* 468 U.S. [420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ], instructs, not every seizure constitutes custody for purposes of *Miranda. Cf. Posr v. Doherty,* 944 F.2d 91, 98 (2d Cir.1991) ("It is not enough to say a person has been arrested simply because, due to police action, he reasonably believes he is not free to leave."). In such cases, a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been

curtailed to a degree associated with formal arrest. *See California v. Beheler,* 463 U.S. at 1125, 103 S.Ct. 3517; *see also Stansbury v. California,* 511 U.S. [318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)]. Only if the answer to this second question is yes[,] was the person "'in custody' for practical purposes," and "entitled to the full panoply of protections prescribed by *Miranda.*" *Berkemer v. McCarty,* 468 U.S. at 440, 104 S.Ct. 3138.

*United States v. Newton,* 369 F.3d 659, 672 (2d Cir.), *cert. denied,* 543 U.S. 947, 125 S.Ct. 371, 160 L.Ed.2d 262 (2004).

■ Recent decisions of the Supreme Court and the Maryland appellate courts make clear that the test for custody is whether a reasonable person would understand that his freedom of action is restricted to a degree associated with a formal arrest. *Shatzer,* 130 S.Ct. at 1224 ("To determine whether a suspect was in *Miranda* custody[,] we have asked whether 'there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'") (quoting *New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)); *State v. Rucker,* 374 Md. 199, 210, 821 A.2d 439 (2003) ("[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."); *Smith,* 186 Md.App. at 533–35, 974 A.2d 991 ("That a detainee may not feel 'free to leave' ... is not a talisman for determining *Miranda's* applicability," but rather, the test is "'whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"); *Buck,* 181 Md.App. at 627, 956 A.2d 884 ("[C]ustody is either a formal arrest or a situation that is tantamount to a formal arrest.").

■ In determining whether a person is in custody, a reviewing court must consider all of the surrounding circumstances. *Bond v. State,* 142 Md.App. 219, 228, 788 A.2d 705 (2002). Factors to consider include:

[W]hen and where it occurred, how long it lasted, how many police were present, what the officers and the defendant

said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning[,] whether he came completely on his own, in response to a police request or escorted by police officers. Finally, what happened after the interrogation[,] whether the defendant left freely, was detained or arrested may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Owens v. State,* 399 Md. 388, 429, 924 A.2d 1072 (2007) (quoting *Whitfield v. State,* 287 Md. 124, 141, 411 A.2d 415 (1980)), *cert. denied,* 552 U.S. 1144, 128 S.Ct. 1064, 169 L.Ed.2d 813 (2008). No one factor is dispositive, but rather, we must consider the totality of the circumstances. *Bond,* 142 Md.App. at 228, 788 A.2d 705.

Maryland appellate courts have applied this test in numerous cases. For example, in *Abeokuto v. State,* 391 Md. 289, 331–32, 893 A.2d 1018 (2006), the Court of Appeals held that the defendant was not in custody where he was questioned at the police station, as a potential suspect, for approximately 90 minutes, even where he previously had been held in a "small locked room" for two and a half hours. The Court stated that the record showed "[n]o coercion of the type the federal or Maryland constitutions prohibit." *Id.* at 333, 893 A.2d 1018.

In *Buck,* 181 Md.App. at 598, 625–26, 956 A.2d 884, this Court held that the defendant was in custody where the interrogation took place in the police station, it lasted five hours, the defendant knew that the police had targeted him as the one who murdered the victim, police drove him to the station house, he was not allowed to move about unescorted during his interview, including during cigarette breaks, and he was asked accusatory questions and to give a DNA sample. Although Mr. Buck was told repeatedly that he was not under arrest, this Court stated that "when a suspect has been told by

the police, clearly and unequivocally, that he is not under arrest and can leave at any time, but the contemporaneous conduct of the police has the effect of nullifying that advice, the advice 'will not carry the day.'" *Id.* at 626, 956 A.2d 884 (quoting LaFave, Criminal Procedure § 66(d) at 737 n. 57 (3d ed. 2007)).

In *McIntyre v. State,* 168 Md.App. 504, 518, 897 A.2d 296 (2006), this Court similarly applied a totality of the circumstances test to the custody analysis. It held that questioning was noncustodial when appellant was questioned near his home in the police officer's unlocked vehicle, the duration of the questioning was short, only one police officer was present, appellant was told that he was not under arrest and he did not have to speak with the officer, the appellant was not physically restrained, there was "no indication whatsoever of 'implied physical restraint,' such as guns drawn or a guard at the door," and appellant was permitted to leave after the interview was concluded.

 These cases are instructive on the issue of custody before us, but, as in all cases, we must consider the totality of the circumstances present in this case. We now turn to consider those circumstances.

## A.

### Circumstances Prior to Questioning

 As indicated, the Court of Appeals has stated that the circumstances prior to questioning are relevant to the determination of custody for *Miranda* purposes. *Owens,* 399 Md. at 429, 924 A.2d 1072. One relevant circumstance is "'how the defendant got to the place of questioning,'" *i.e.,* "'whether he came completely on his own, in response to a police request or [was] escorted by police officers.'" *Owens,* 399 Md. at 429, 924 A.2d 1072 (quoting *Whitfield,* 287 Md. at 141, 411 A.2d 415). When a defendant is escorted to the police station by the police, that is a factor weighing in favor of a finding of custody. *See Buck,* 181 Md.App. at 625, 956 A.2d 884 (defendant held to be in custody, in part because he "did

not go to the station house to speak with the detectives completely on his own; nor did he contact them initially"). When the defendant drives himself to the place of interrogation, by contrast, that fact weighs against a finding of custody. *See Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (fact weighing against a finding that Mr. Alvarado was in custody was that the police "did not transport Alvarado to the station or require him to appear at a particular time").

Here, a police officer called appellee and asked if he could "come down to the [police] station," telling him that it had to do with one of his children. Appellee agreed and drove himself to the police station. Although the police initiated the contact, the record reflects that the police requested appellee's presence rather than demanded it, and appellee drove himself to the police station. These facts do not suggest police coercion or restraint. Indeed, by driving himself, appellee had the ability to drive himself home if he had decided to end the interview and leave. The circumstances preceding the interview weigh against a finding of custody.

## B.

### Circumstances During Questioning

With respect to the circumstances during questioning, the Court of Appeals has listed the following factors as relevant in the custody analysis:

> when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness.

*Owens*, 399 Md. at 429, 924 A.2d 1072 (quoting *Whitfield*, 287 Md. at 124, 411 A.2d 415). *See also* Jezic, Maryland Law of Confessions § 8.4 at 278–83 (2010–2011 ed.) (listing 35 factors

occurring before, during, and after the questioning as being relevant in a determination of custody).

Starting with the place where the interrogation occurred, the questioning here took place in a police station. The circuit court found that "being interviewed by the police . . . particularly in a police station is inherently coercive."

██ To be sure, questioning at the police station is more likely to be determined to be custodial interrogation, but it is not dispositive on the custody analysis. The Supreme Court has "explicitly recognized that *Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" *Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). The Court of Appeals similarly has explained that questioning occurring in a police station is not, *per se*, custodial interrogation. *Abeokuto*, 391 Md. at 332, 893 A.2d 1018. The Court stated:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."

*Id.* at 332–33, 893 A.2d 1018 (quoting *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711).

Thus, that the questioning of appellee occurred in a police station is a factor to consider, but it is not determinative. Moreover, we note that the interview here occurred in a child interview room, with teddy bears and a couch. This room,

which Detective Thorpe characterized as one that did "not look like a police facility," was not, by itself, intimidating.

We turn next to the manner in which the interview was conducted. The trial court found, and the record reflects, that the officers were "polite," "courteous," and "respectful." This weighs in favor of a finding that appellee was not in custody. *See State v. Smith,* 546 N.W.2d 916, 924 (Iowa 1996) (court looks to "whether a confrontational and aggressive style is utilized in questioning, or whether the circumstances seem more relaxed and investigatory in nature"). Only two officers were present during the questioning, and they both were unarmed and dressed in plain clothes. These facts weigh against a finding that the questioning was conducted in a coercive manner. *See id.* (noting cases finding custody where numerous officers were present and some visibly armed, but no custody where only two officers were present).

With respect to whether there was "the presence of actual physical restraint . . . or things equivalent to actual restraint," *Owens,* 399 Md. at 429, 924 A.2d 1072 (quoting *Whitfield,* 287 Md. at 141, 411 A.2d 415), that factor also weighs against a custody finding. Appellee was never physically restrained, and there was no armed guard at the door. Although the two officers sat between appellee and the door, the officers were unarmed and never indicated that they would stop appellee from leaving. In fact, they specifically advised that the door was unlocked.

Moreover, appellee was told, on several occasions, that he was not under arrest. Detective Thorpe so advised appellee at the beginning of the questioning. Toward the end of the questioning, when appellee sought to clarify that he was not under arrest, but he was going to jail, Detective Thorpe stated: "I don't like to lie to people, so what I will tell you is that you're not going to jail tonight. Is there a possibility that you will in the near future? There is a possibility."

That a suspect is told that he is not under arrest generally weighs in favor of a finding of no custody. *See Ashe v. State,* 125 Md.App. 537, 551–52, 726 A.2d 786 (1999) (defen-

dant was not in custody where defendant accompanied officers to police station, and he was told that he was not under arrest and was free to go at any time), *cert. denied,* 354 Md. 571, 731 A.2d 969 (1999). As indicated, however, there may be occasions where such a statement is discounted: "[W]hen a suspect has been told by the police, clearly and unequivocally, that he is not under arrest and can leave at any time, but the contemporaneous conduct of the police has the effect of nullifying that advice, the advice 'will not carry the day.'" *Buck,* 181 Md.App. at 626, 956 A.2d 884 (quoting LaFave, Criminal Procedure § 6.6(d) at 737 n. 57 (3rd ed. 2007)).

In *Buck,* the suspect was transported to the police station, by the police, who made clear that Buck was a murder suspect, and the police interrogated Buck for over six hours, "during which time Buck was not allowed to move about unescorted and was at all times being watched." *Id.* at 625–27, 956 A.2d 884. Here, by contrast, appellee drove himself to the station, he was interviewed for approximately an hour and a half, and he was not accompanied by the police during the entire interview; he was left alone to write a letter to his daughter and told that he could use the restroom. The circumstances of the questioning in this case did not nullify the advice that appellee was not under arrest. Under these circumstances, the repeated statements that appellee was not under arrest weighs in favor of a finding that appellee was not in custody.

■■■ Another factor to consider in the custody analysis is "'whether the defendant was being questioned as a suspect or as a witness.'" *Owens,* 399 Md. at 429, 924 A.2d 1072 (quoting *Whitfield,* 287 Md. at 141, 411 A.2d 415). This factor is relevant, however, only if it is communicated to the suspect because "custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury,* 511 U.S. at 323, 325, 114 S.Ct. 1526. As the Supreme Court has explained:

> An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her " 'freedom of action.' "

*Id.* (citations omitted).

This factor, similar to the other factors in the custody analysis, is not dispositive. The Supreme Court has explained:

> Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case. In sum, an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

*Id. Accord Buck,* 181 Md.App. at 624, 956 A.2d 884 ("one factor in assessing the existence of custody" is whether the suspect is aware, during the interrogation, that he is the "focus of [the] investigation"); *Whitfield,* 287 Md. at 142, 411 A.2d 415 (factor in finding custody included that the defendant was the "prime suspect").

Here, appellee knew, before arriving at the police station, based on his conversation with his wife, that he was being investigated for sexually abusing his daughter. At the beginning of the interview, appellee advised the officers that he knew he was there to talk about his daughter, stating that it was "kind of hard to talk about." Detective Thorpe told

appellee that they had spoken with C., and she told them "some things that have been going on for quite some time between you and her." Appellee then admitted to touching and abusing his daughter.

The circuit court considered as a strong factor in favor of finding custody that appellee not only knew he was a suspect, but he actually admitted sexually abusing his daughter. The court stated that "no reasonable person would have thought they could get up and walk out of that room after they confessed to committing a violent crime."

Courts have taken different views on whether an interrogation becomes custodial when a suspect incriminates himself. Some courts, similar to the circuit court here, appear to view this factor as dispositive. *See Jackson v. State,* 272 Ga. 191, 528 S.E.2d 232, 235 (2000) ("A reasonable person in [defendant's] position, having just confessed to involvement in a crime in the presence of law enforcement officers would, from that time forward, perceive himself to be in custody."); *People v. Ripic,* 182 A.D.2d 226, 587 N.Y.S.2d 776, 782 (N.Y.App.Div. 1992) ("[I]t is utter sophistry to suggest that a person in defendant's position, having made such an incriminating statement to police officers concerning the very homicide they were investigating, would feel that she was not under arrest and was free to leave.").

Other courts take the view that a confession by a suspect does not automatically transform a noncustodial interview into a custodial interrogation, but rather, it is merely one factor in the totality of the circumstances. In *State v. Oney,* 187 Vt. 56, 989 A.2d 995, 999–1000 (2009), the Supreme Court of Vermont opined:

> A noncustodial situation does not become custodial automatically because the interviewee has confessed to a crime. See, e.g., *United States v. Chee,* 514 F.3d 1106, 1114 (10th Cir.2008) (holding that defendant was not in custody even after confessing to sexual assault). A confession is just one of the circumstances to consider in evaluating whether a reasonable person would believe he or she was free to leave.

*See id.; Graham v. United States,* 950 A.2d 717, 730–31 (D.C.2008); *State v. Champion,* 533 N.W.2d 40, 43 (Minn. 1995).

The court stated that "the severity of the crime confessed to affects the weight" given to this factor, explaining that, "once a suspect confesses to committing a serious criminal act, this fact is significant in this evaluation." *Id.*

In *Commonwealth v. Hilton,* 443 Mass. 597, 823 N.E.2d 383, 396 (2005), the Supreme Judicial Court of Massachusetts stated that a "noncustodial setting can become custodial" if "a suspect makes incriminating statements." It explained, however, that "an interview does not automatically become custodial at the instant a defendant starts to confess." *Id.* The Court declined "to 'freeze-frame' the instant when the defendant first made an inculpatory remark," looking instead to whether the statement resulted in a "fundamental transformation in the atmosphere" of the questioning. *Id.* at 396–97 (quoting *Commonwealth v. Bryant,* 390 Mass. 729, 459 N.E.2d 792, 799 (1984)). In that case, because the defendant's initial confession did not result in "any change in the tenor of the questioning or any apparent change in her status," the court found no custody at that point. *Id.* at 397.[12] *Accord State v. Lapointe,* 237 Conn. 694, 678 A.2d 942, 958 (1996) (Although "admissions of culpability may lead the police either to arrest a suspect or to place restraints on his freedom approximating an arrest, the police in this case never altered the circumstances of their interviews of the defendant in such a way that his initial noncustodial status became custodial"), *cert. denied,* 519 U.S. 994, 117 S.Ct. 484, 136 L.Ed.2d 378 (1996).

We conclude that the better reasoned view is that a suspect's admission to a serious crime during police questioning does not automatically render the interrogation custodial.

---

12. The court found that the setting subsequently became custodial when a new officer, who was identified as someone with expertise in investigating fires, was brought into the room to engage in detailed questioning. *Commonwealth v. Hilton,* 443 Mass. 597, 823 N.E.2d 383, 397 (2005).

Rather, it is one factor to consider in assessing whether, under the totality of the circumstances, a reasonable person would believe there was a formal arrest or a restraint on freedom of movement to the degree associated with formal arrest. A significant consideration in this analysis is whether the incriminating statement changed the atmosphere of the interrogation.

Here, early on in the interview, appellee admitted to engaging in sexual conduct with his 14–year–old daughter. Although this was an admission to a serious crime, none of the objective circumstances of the interrogation changed as a result of appellee's inculpatory remarks. Appellee's incriminating statements did not render the interrogation custodial.

## C.

### Circumstances After Questioning

Another factor considered by the Maryland appellate courts in the custody analysis is whether the defendant was arrested after the interrogation. Significant weight is given to the fact that a suspect was not arrested after questioning. *See Minehan v. State,* 147 Md.App. 432, 442, 809 A.2d 66, *cert. denied,* 372 Md. 431, 813 A.2d 258 (2002) ("[T]here is rarely custody when the person questioned leaves the interrogation unencumbered, only to be arrested at a later time."); *Cummings v. State,* 27 Md.App. 361, 378, 341 A.2d 294 (1975) ("It is almost universally the law that where a suspect is not arrested and is allowed to remain free following the interview, the interrogation is deemed to have been non-custodial."). *Abeokuto,* 391 Md. at 333–34, 893 A.2d 1018 (finding that the suspect was not in custody because, among other factors, he was not arrested during the questioning, and he was released after questioning).

In this case, appellee was arrested twenty minutes after the questioning was concluded. As explained below, however, this did not transform the questioning into custodial interrogation.

The Supreme Court of Connecticut has stated that, although the failure to arrest a suspect supports a finding of no custody, the reverse may not be true; that the defendant was arrested after the interrogation does not necessarily mean that he or she was in custody during the interrogation. *State v. Pinder*, 250 Conn. 385, 736 A.2d 857, 876 (1999). The court in *Pinder* explained:

> Although the act of leaving may, in hindsight, lend credence to a determination that the suspect was actually free to leave during the course of the questioning, the reverse conclusion—that being arrested later somehow proves that the suspect was not free to leave at an earlier time—is not necessarily accurate.

*Id.*

Detective Thorpe testified, without contradiction, that when she began the interview, she did not intend to place appellee under arrest. Her intentions changed "toward the end of the interview," when appellee told her that he "wasn't coping well," and she "became concerned about his safety." Although Detective Thorpe's subjective intent is not a factor, it is consistent with the manner of the questioning here. Appellee's arrest under the facts of this case should be given neutral status; it does not weigh in favor of or against a finding of custody.

## D.

### Totality of the Circumstances

Assessing the totality of the circumstances, we hold that appellee's statements to the police were not the product of custodial interrogation. In so holding, we find it significant that: (1) appellee drove himself to the station; (2) when he arrived at the station, he was not restrained and was told that the door to the interview room was unlocked; (3) the officers were in plain clothes, without weapons, and they were polite, courteous, and respectful; (4) the police repeatedly told appellee that he was not under arrest; and (5) appellee was not

extensively controlled during the interview; he was left alone to write a letter and use the restroom if he desired.

Appellee did not meet his burden of showing that he was not in custody at the time he made his statements. Accordingly, the circuit court erred in suppressing the statements on this ground.

## II.

### Voluntariness of the Statement

■ Appellee next contends that, even if he was not in custody for *Miranda* purposes, the majority of his statements should be suppressed because they were involuntary, due to improper inducements by the police. He argues that, after he "admitted to 'touching' his daughter in her private areas," the police implied that, "if appellee wanted the police to get his daughter the help she needed, he needed to tell them what happened." He argues that the remainder of his confession was made "in direct reliance to such inducements," and therefore, these statements "should be suppressed for being involuntary."

The State argues that "the lower court expressly refused to rule on voluntariness," and therefore, "there are no findings of fact on this issue," which renders the record insufficient for this Court to address appellee's voluntariness claim. It further notes that there are no findings of fact because defense counsel expressly asked the court "*not to rule*, arguing that it was a 'moot point.'" Accordingly, the State asserts that this Court should decline to address the voluntariness claim.

The State further argues that appellee's claim that his statements were involuntary is without merit. It contends that the officer's assertions, suggesting that if appellee made a statement, it would benefit his daughter, was not an improper inducement.

■ When a defendant alleges that his confession was involuntary because of police inducements, a trial court must conduct a two-step analysis:

First, the trial court determines whether any officer or agent of the police force promised or implied to the suspect that he or she would be given special consideration from a prosecuting authority or some other form of assistance in exchange for the confession. Second, if the court determines that such a promise was explicitly or implicitly made, it decides whether the suspect's confession was made in apparent reliance on the promise.

*Knight v. State,* 381 Md. 517, 533–34, 850 A.2d 1179 (2004).

Here, after the court suppressed the statement based on a *Miranda* violation, the prosecutor asked the court to "make a ruling as to voluntariness for appeal purposes as well," noting that appellee had argued that the statement was involuntary. Defense counsel stated that it was a "moot point" because the court had "already suppressed the statements." The court declined to make any ruling apart from the custody issue.

The State relies on *Rush v. State,* 403 Md. 68, 939 A.2d 689 (2008), in support of its argument that the record is not adequate for this Court to address the voluntariness issue. In that case, the State appealed from the circuit court's ruling that the police questioning of Rush violated *Miranda,* and appellee argued, similar to this case, that even if the interrogation satisfied *Miranda,* the statements should be suppressed because they were involuntary. *Id.* at 89, 95, 939 A.2d 689. The Court of Appeals declined to address the issue because the record was inadequate. *Id.* at 104, 939 A.2d 689.

The procedural posture in *Rush* was different from this case. In *Rush,* the circuit court had ruled on the voluntariness issue, finding that the statements were voluntary, and the Court of Appeals had in the record a transcript of the police interview to read as well as a digital recording of the interview that the Court could hear. *Id.* The Court held that this record was not sufficient to address the voluntariness issue because "inferences drawn from viewing the interview DVD, through observation of the inflictions and demeanor exhibited by both Rush and Detective Jernigan, may differ from those inferences that can be drawn from the bare transcript." *Id.*

Here, in contrast to *Rush,* we do have an interview DVD to view. In this case, however, the circuit court did not rule on the voluntariness issue. It made no factual findings on the issue, including whether it found credible appellee's testimony that he confessed in reliance on the statements by the police regarding obtaining help for his daughter. Under these circumstances, with no factual findings by the circuit court on the issue of voluntariness, the record is not adequate for review of the issue by this Court.[13]

We decline to address the argument that appellee's statements were involuntary. Appellee is free to raise the issue in the circuit court.

**JUDGMENT REVERSED. COSTS TO BE PAID BY APPELLEE.**

---

**13.** An additional reason not to consider the issue here is the practical consequence of affirming the circuit court on a ground not raised by the State. Pursuant to Md.Code (2006 Repl.Vol.) § 12–302(c)(3)(iv) of the Courts and Judicial Proceedings Article, "[e]xcept in a homicide case," if the State appeals a ruling suppressing a statement, and if "the decision of the trial court is affirmed, the charges against the defendant shall be dismissed" and "the State may not prosecute the defendant on those specific charges or on any other related charges arising out of the same incident."

Thus, pursuant to this statute, the State has a tactical decision to make when the defense prevails on a motion to suppress: (1) proceed with the remaining evidence available and risk an acquittal of the charges; or (2) appeal and risk the ability to try the defendant at all if the State loses the appeal. Here, the State chose to appeal the issue decided by the court, and it prevailed on appeal. By ruling on a ground not decided by the trial court, this Court would impair the State's ability to make a tactical decision in this regard. This consequence, combined with the fact that the State sought a ruling by the circuit court on voluntariness, and the defense objected to such a ruling, weighs against our addressing the issue. We reiterate what the Court of Appeals stated in *Rush v. State,* 403 Md. 68, 939 A.2d 689 (2008): "It would be advisable for a trial judge in a similar situation to rule specifically on each ground presented in a motion to suppress." *Id.* at 104 n. 15, 939 A.2d 689.