57 A.3d 1084

Guillermo AGUILERA–TOVAR

v.

STATE of Maryland.

No. 1841, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Dec. 20, 2012.

Piedad Gomez (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Sara Page Pritzlaff (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., KEHOE, J. FREDERICK SHARER (Retired, Specially Assigned), JJ.

KRAUSER, C.J.

Convicted by a jury in the Circuit Court for Montgomery County of one count of sexual abuse of a minor [1] and three counts of third-degree sexual offense,[2] Guillermo Aguilera–Tovar, appellant, presents two issues for our review. They are: whether the trial court erred in denying his motion to suppress the post-polygraph statements he made to the police and whether he was denied a fair trial.

Because we conclude that the statements appellant made to the police, following his polygraph examination, were unlawfully obtained and should have been suppressed, we reverse appellant's convictions and remand for further proceedings, without reaching the second issue, that is, whether appellant was denied a fair trial.

---

1. Md.Code (2002), § 3–602 of the Criminal Law Article.

2. Md.Code (2002), § 3–307 of the Criminal Law Article.

### Suppression Hearing

Before trial, a hearing was held on appellant's motion to suppress statements he had made to police detectives during an interview at the building housing the Family Crimes Division of the Montgomery County Police Department. At that hearing, three detectives testified: Karen Carvajal, Miguel Marquez, and Chad Williams.

According to their collective testimony, Fidel Z.,[3] on November 2, 2009, contacted the Family Crimes Division to report that his seven-year-old son, Angel Z., had been fondled by appellant one week earlier at the Rockville home that he, his girlfriend, and her children shared with appellant, his girlfriend, and their children.[4] Following that disclosure, Detective Williams arranged for Angel to be interviewed by a social worker employed by Child Protective Services of the Montgomery County Department of Health and Human Services. Angel told the social worker, according to the detective,[5] that appellant had made him fondle appellant's "genital area," and then he had attempted to penetrate Angel's anus, with his penis.

Accompanied by Detective Carvajal, who was fluent in Spanish, Detective Williams drove to appellant's Rockville home. The detectives were in plain clothes but wore identification badges about their necks. When they arrived, the two detectives left their car and walked up to the door, where Detective Carvajal was greeted by an unidentified woman.

---

**3.** To protect the identity of the child-victim in this case, we abbreviate his last name, as well as the last name of any family member, having the same last name.

**4.** To be more specific, Fidel Z. lived with his girlfriend, Veronica Leiva, and her children, in the upper level of a house in Rockville; while appellant and his girlfriend, Angela Leiva Aguilera, who was Veronica's sister, lived on the lower level of the same dwelling, with their children. Angel Z. was Fidel's son by another woman, and the alleged abuse took place while Angel was visiting his father at the Rockville home.

**5.** The social worker did not testify at the suppression hearing, though he did at appellant's trial.

After the woman was asked by the detectives whether appellant was home, she left the detectives, only to return, a few minutes later, with appellant.

In Spanish, Detective Carvajal asked appellant whether he could speak with them "privately." After appellant stepped "outside," Detective Carvajal suggested that they talk in the detectives' car. Appellant agreed and accompanied them to that vehicle.

As the detectives and appellant sat inside the detectives' car, Detective Carvajal advised appellant that "he was not under arrest" and asked him if he knew why they were there. Appellant replied that he did. At the conclusion of the interview, during which appellant, in the court's words, "denied whatever the accusations were," appellant agreed to take a polygraph examination the following morning. No mention was made by either detective that an interrogation [6] by police would or even might follow that exam.

The detectives and appellant then walked back to the house. Standing just outside the house, the detectives spoke with several members of the family, who, in the words of Detective Carvajal, "came out to talk." Angela Leiva Aguilera, appellant's girlfriend (and later his wife),[7] agreed to be interviewed, with the couple's children, at the Family Crimes Division the following morning.

The next morning, appellant, Ms. Aguilera, and their children arrived at the Family Crimes Division. The building housing that division has, in the words of Detective Carvajal, a "big blue sign right outside the door," indicating that it is a "police facility." Although the signage was in English, the

---

**6.** We refer to the post-polygraph interview as an "interrogation," as the suppression court found that it was precisely that, and the State does not contend otherwise.

**7.** At trial, Ms. Aguilera testified that she and appellant were married on December 3, 2009, although, during the post-polygraph interrogation that took place on November 3, 2009, she is referred to as appellant's "wife."

court observed that the Spanish and English words for "police" look "pretty much the same." [8]

While Ms. Aguilera and the children were taken by Detective Williams to be interviewed by a social worker from Child Protective Services, appellant was escorted to the polygraph suite by Detective Carvajal, where she left him with Detective Marquez, the polygraph examiner. Detective Marquez conducted the ensuing polygraph examination of appellant in Spanish. The examination lasted about an hour.

At its inception, Detective Marquez explained to appellant that "he was there voluntarily and that he could leave at any time." When he asked appellant whether he knew why he was being asked to take a polygraph test, appellant acknowledged, according to the detective, that it was because of allegations that he had molested Angel Z. At no time before or during the polygraph test was appellant advised of his *Miranda*[9] rights.

When the polygraph examination ended, appellant, accompanied by Detective Marquez, walked back to the "adult interview" rooms and entered one of them, where they were greeted by Detectives Carvajal and Williams.[10] Appellant then expressed a desire to use the restroom. While appellant was being escorted to the men's room, Detective Marquez advised Carvajal and Williams of the outcome of the polygraph test, telling them that the "results were indicative of deception."

When appellant finished using the restroom, he was escorted back to an "adult interview" room, where he sat, by

---

8. The Spanish word for police is "policia."

9. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

10. As Detective Carvajal explained, the polygraph suite and the adult interview rooms are "in the same building." To go from one to the other, however, it is necessary to leave the building and re-enter through an outside door, because there is no interior connection between the polygraph suite and the adult interview rooms.

himself, for about ten to fifteen minutes. The room was windowless and had a single door that closed but did not lock. It contained a table where appellant sat, at one end, in a corner farthest from the door. When Detectives Carvajal and Williams entered the room, Detective Williams sat across the table from appellant, while Detective Carvajal sat between appellant and the door.

Detective Carvajal testified that she was in plain clothes, unarmed, and that, in fact, "[e]veryone" who worked there was in plain clothes. The ensuing interrogation, which lasted about an hour and a half, was conducted in Spanish by Detective Carvajal, and it was video recorded.[11] Although Detective Williams was in the room during much of the interrogation, he occasionally left the room for short periods of time and re-entered, because, as he did not speak Spanish, he could not directly participate in the interrogation. At no time before or during the interrogation was appellant advised of his *Miranda* rights.

After greeting appellant, Detective Carvajal informed him that the detectives "wanted to speak to [him] about the results" of the polygraph test. She then told appellant that Detective Marquez had showed her the test results. "[L]ook, look and see how your results came out. . . . [Y]ou didn't do well Guillermo. You didn't pass the test," she exclaimed.

When appellant failed to respond, she continued, "that means that something obviously happened with you and Angel." "You are not," she persisted, "telling us the whole truth about what happened with him." Then, not pausing for a response, she added, "maybe it did not happen the way Angel said, but something, something must have happened, or you would not have, the test would not have gone so badly." When, in response to her accusations, appellant said, "Like I told you, I've never done anything to him," the detective assured him that she did not believe that he "had the intention

---

11. The video and a transcript of the interrogation, in both English and Spanish, were introduced at the suppression hearing.

that day ... of ... abusing" Angel but insisted that "something happened, something happened, Guillermo."

Failing to obtain an inculpatory response from appellant, Detective Carvajal pressed forward with the question: "[W]hat happens if we tell [your wife] that you, that we did this test on you, ... that is it [sic] almost (100%) correct or that the probability that something happened, because the test is (100%) uh, almost (100%) uh, what is she going to say?", adding: "Now you have the chance to, to tell the truth, and maybe it's not so bad" but that "the way it looks right now" is "the way Angel told it." Then, avowing that Angel "doesn't have a reason to lie," the detective demanded that appellant explain "why ... you didn't pass this test." When appellant answered, "I have never touched him, nor has he touched me anywhere," the detective inquired, "So how do we settle it? Because now we have the, the, he who is saying that, that this happened, ... you who is saying no, but that, that, you took this test and you couldn't pass it, which says that you're lying, so, what do we do? How can we settle this?"

Then, taking a different tack, Detective Carvajal said, "[i]f it was Angel's idea [to touch you], it's not your fault," whereupon appellant responded that he did not feel Angel touching him but conceded that he "[did not] know." The detective retorted:

Like, well, you do know, Guillermo, because you, the test, the results of the test ... were like that, because you know something. You thought something, you remember something, or if not, you wouldn't have, you wouldn't have, you could have passed it. Do you understand me? If, if nothing really happened, or if you don't remember that nothing happened, ... you would not have done badly in the test. But, obviously you have to, you were thinking something about what happened. You were remembering something, or, or you were thinking about something that happened with Angel, and that's why you could not pass it. Now the test, uh, does not distinguish between something true—a big lie and a small lie. For the test, a lie is a lie. It doesn't matter if it's a big lie or a small one, OK? And that's why

I'm trying to explain to you, and, and, and give you the opportunity to explain to me because the question he asked you is if you had, he, if Angel had touched your penis, . . . OK?

"The only thing I know," concluded Detective Carvajal, "is that this test . . . says that you lied." When appellant again denied that any inappropriate touching had occurred, the detective would have none of it: "But you felt something, otherwise you wouldn't have, you wouldn't have, you would not have done like that on the test, Guillermo." Then, adopting a more conciliatory tone, she said: "But that's why we're only talking, because if it had been something more serious, OK, if you had raped him . . . but this really is minor, and we're only trying to see how we're going to fix this. . . . But I think that this, this is something that can be resolved in another way, talking about the situation, to see how we're going to fix this."

As the interview progressed, appellant's story began to change. Although he initially denied that anything had happened between Angel and him, he eventually admitted that he had been hugging and tickling Angel, as he "always" did, but that there had been "nothing more." But, later, appellant conceded that, as the two played, his penis had hardened and that Angel had grabbed it on his own initiative, "as if he had done it on purpose to put his hand inside or something" and not because he, appellant, had forced Angel to do anything. And he insisted that, when Angel touched him, he told the child to "go upstairs" and that "[t]hat was all" and, furthermore, that "nothing bad" had happened. At that point, Detective Carvajal told appellant that she would tell Angel what he had said.

Appellant was then allowed to use the restroom without an escort, provided that he agreed to return to the interview room. While appellant was in the restroom, Detective Carvajal conferred with Detective Williams and "let him know what was going on." Williams asked Carvajal to pose "follow-up questions" to appellant about "[o]ther family members that were in Maryland, other family members that were abroad,

his current employment, and his immigration status." When appellant returned from the restroom, Detective Carvajal asked him those questions and learned, among other things, that he had cousins in Baltimore, Cleveland, and Kansas; that he was unemployed; that he was from Mexico; and that he was illegally in the United States.

After briefly stepping outside the interview room and informing Detective Williams of appellant's answers, Detective Carvajal re-entered the interview room, along with the social worker assigned to the case, who then confronted appellant with Angel's accusation that he had "touched [Angel's] butt with" his penis. Appellant denied the accusation, suggesting that Angel was "lying or something" and that "nothing happened." At that time, Detective Williams re-entered the room and placed him under arrest.

### Suppression Ruling

At the conclusion of the hearing, the suppression court stated that "there certainly was an interrogation involved," and, thus, the only issue that remained was whether appellant was in custody during that interrogation. Holding that he was not, the court found that appellant was told by "the police" that he was "free to go" (but did not specify when this occurred); [12] that, when police visited appellant at his residence, the day before the station house interrogation, he "voluntarily accompanie[d]" the detectives to their car; that, during the ensuing vehicular interview, "he denied the accusations" but agreed to go to the Family Crimes Division the following morning to take a polygraph examination; that he knew "the purpose" of that visit, which was "to give him a test to determine whether or not [he was] telling the truth"; that appellant "came [sic] voluntarily, due to his appointment," to the police station to submit to the polygraph examination; that appellant "knew they were police"; that there was a "big

---

12. Whether the motions court was referring to the November 3, 2009 in-station interrogation or the November 2, 2009 in-car interview, or both, is unclear.

sign" outside the entrance which identified the building as a police facility; and that nothing before or during the station house interrogation prevented him from leaving the police station at anytime. The court therefore held, as noted, that appellant was not in custody at the time he made the post-polygraph statements; that those statements were voluntary; and that, as a consequence, his statements passed were admissible at trial . . .

### Discussion

Appellant contends that the trial court erred in denying his motion to suppress his post-polygraph statements to the police, because, at the time he gave those statements to the police, he was in custody and yet had not been given the *Miranda* advisements.

But, before we proceed down this path, we must first determine whether a review of this issue is even appropriate, given the State's claim that this issue was not preserved for our consideration. A review of the record shows that it was.

As part of its custody determination, the suppression court plainly considered whether appellant was confronted with the results of the polygraph examination and the effect of that confrontation, stating that it did not "know why [there would] be any reason to believe that once they told him that he failed the polygraph test," he would have felt compelled to remain at the police station. As Maryland Rule 8–131(a) requires: For an issue to be preserved for appellate review, it must either "have been raised in or decided by the trial court," and as this issue was decided by the suppression court, we need say no more.

■ The prosecution may not introduce, in its case-in-chief at the trial of a defendant, a statement made by that defendant during a custodial interrogation unless, during that interrogation, the police first advise the defendant that "he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed."

*Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The corollary to this rule is that, to successfully claim the right to such advisements, a defendant must show that, at the time he gave his statement to police, he was in custody and was being subjected to an interrogation. *State v. Thomas,* 202 Md.App. 545, 565, 33 A.3d 494 (2011), *aff'd,* 429 Md. 246, 55 A.3d 680 (2012).

In this case, it was, as the suppression court observed, undisputed that appellant was subjected to an interrogation at the time he made the statements at issue. Thus, the only question before us is whether appellant was also in custody at that time, thereby rendering his "interview" a "custodial interrogation," the sine qua non of *Miranda* advisements.

■ This question requires that we perform "an objective inquiry." *J.D.B. v. North Carolina,* 564 U.S. ——, 131 S.Ct. 2394, 2402, 180 L.Ed.2d 310 (2011). That is to say, the test for determining whether an individual is in custody is "whether a reasonable person would understand that his freedom of action is restricted to a degree associated with formal arrest." *Thomas,* 202 Md.App. at 567, 33 A.3d 494; *see also Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (stating that the "ultimate inquiry" in determining *Miranda* custody is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest") (internal quotation marks and alterations omitted).

■ Among the many factors that are relevant to that inquiry are:

"when and where [the interrogation] occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness."

*Owens v. State,* 399 Md. 388, 429, 924 A.2d 1072 (2007) (quoting *Whitfield v. State,* 287 Md. 124, 141, 411 A.2d 415 (1980)).

But the principal factor raised by appellant is one that has not been previously addressed by our appellate courts.[13] It is: whether a defendant, confronted with negative polygraph results during his interrogation, where that confrontation is persistent, unrelenting, and accusatory, is "in custody" for *Miranda* purposes, in light of surrounding circumstances.

▮▮▮ Because the test is objective, we need be mindful that the subjective views of the officer and suspect are irrelevant. *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam). Indeed, the "frailties or idiosyncrasies" of the suspect, if not a child,[14] are not factors in the custody analysis. *J.D.B.,* 564 U.S. at ——, 131 S.Ct. at 2404 (quoting *Yarborough v. Alvarado,* 541 U.S. 652,

---

13. Several Maryland decisions have considered the admissibility of polygraph results in criminal trials, where the defendant was confronted with the "failed" test results. *See, e.g., Murphy v. State,* 105 Md.App. 303, 659 A.2d 384 (1995) (holding that trial court erred in admitting evidence regarding defendant's polygraph test because the voluntariness of his confession was not at issue and the evidence was highly prejudicial); *Mitchell v. State,* 51 Md.App. 347, 443 A.2d 651 (1982) (holding that, where defendant conceded that polygraph test did not "in any manner" influence him to make inculpatory statements, trial court correctly refused defendant's request to admit into evidence the fact that polygraph tests had been administered to him); *Johnson v. State,* 31 Md.App. 303, 355 A.2d 504 (1976) (holding that trial court improperly excluded from the jury's consideration of the voluntariness of defendant's confession the fact that a polygraph was used to obtain the confession). None of these cases addressed whether confronting a defendant with negative polygraph results during an interrogation is a factor in determining *Miranda* custody.

14. *See J.D.B. v. North Carolina,* 564 U.S. ——, 131 S.Ct. 2394, 2406, 180 L.Ed.2d 310 (2011) ("[S]o long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test"); *In re Joshua David C.,* 116 Md.App. 580, 594, 698 A.2d 1155 (1997) ("[I]n determining whether a juvenile's statement was made while in custody, the court must consider additional factors, such as the juvenile's education, age, and intelligence.").

662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)).[15] Simply put, the inquiry is "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Alvarado,* 541 U.S. at 663, 124 S.Ct. 2140 (internal quotation marks omitted).

■ A review of all of the circumstances surrounding appellant's inculpatory statements, none of which are in dispute, leads us to conclude, after "perform[ing] our own independent constitutional appraisal of the law as it applies to the facts of the case," *Collins v. State,* 192 Md.App. 192, 215, 993 A.2d 1175 (2010), that appellant was "in custody," when he gave those statements to Detective Carvajal following his polygraph examination. At the time he made the statements at issue to police, he was in an interrogation room at a police station and was aware that he was a suspect. Although these factors are hardly dispositive of the question of custody (see *Thomas,* 202 Md.App. at 571, 33 A.3d 494 and cases cited therein), they are to be considered and weigh in favor of a finding of custody. *Id. See Cummings v. State,* 27 Md.App. 361, 369, 341 A.2d 294 (1975) ("Although the place of interrogation is not the conclusive or sole factor to be considered in determining the fact of custody, it is a vital factor.").

■ When a suspect is made aware of the fact, as he was here, that he is a suspect in a case and is not merely being questioned as a witness, that too weighs in favor of a finding of custody. *See Buck v. State,* 181 Md.App. 585, 624, 956 A.2d 884 (2008) ("one factor in assessing the existence of custody" is

---

**15.** *But see United States v. Beraun–Panez,* 812 F.2d 578, 580–81 (9th Cir.1987), *as corrected,* 830 F.2d 127 (9th Cir.1987) (upholding a trial court's use of a "refined" objective standard of "how a reasonable person who was an alien" would have perceived his encounter with law enforcement agents when the agents knew of the suspect's alien status and mentioned to him "the possibility that he would be deported and separated from his family"); *United States v. Moreno,* 742 F.2d 532, 537–38 (9th Cir.1984) (Wallace, J., concurring) (stating that, in the *Miranda* context, while an alien's familiarity with the United States's police procedures has no place in determining custody, an alien's inability to speak or understand English, especially if known to the police, may).

whether the suspect is aware, during the interrogation, that he is the "focus of [the] investigation"). The day before the polygraph, when Detective Carvajal asked appellant, as they both sat in a police car, if he was aware of why the detectives were speaking with him, appellant acknowledged that he knew he was suspected of having fondled Angel. Furthermore, just before the polygraph examination, appellant confided to Detective Marquez that he agreed to submit to that test because of the suspicion that he had molested Angel. Finally, during the post-polygraph interrogation by Detective Carvajal, it is clear that appellant knew that child-sex-abuse allegations had been made against him and that he was suspected of that crime, as evidenced by his statement early in the interview, "Like I told you, I've never done anything to [Angel]." This factor thus weighs in favor of a finding of custody.

There is one circumstance though, that adds substantial weight in favor of a finding of custody. Appellant, as previously noted, submitted to a polygraph test before he was questioned at the police station by Detective Carvajal. A post-polygraph interview was conducted as the detectives "wanted to speak to [appellant] about the results." During that "interview," Detective Carvajal confronted appellant repeatedly and persistently with the fact that he had failed his polygraph test and that that test showed that he had "lied" about the sex abuse allegations.

The detective began appellant's interrogation by asserting that appellant's purported failure of his polygraph test showed that "something obviously happened" between him and Angel. As appellant sat and said little, the detective repeated, "something happened, something happened, Guillermo," and "how [was it] that you didn't pass this test[?]," she demanded.

While appellant continued to deny that he had had any sexual contact with the victim, Detective Carvajal pressed on, insisting that appellant was not telling the "whole truth" and that the test indicated that he, appellant, was "lying." She suggested that, during his polygraph examination, he was

"remembering something ... that happened with" the victim, and that was why he "could not pass" the polygraph test.

When accusations as to what the test showed did not produce the kind of statements the detective hoped for, she turned to threats, telling appellant that she would inform his wife of the polygraph results and that those results showed "that the probability that something happened" was "almost (100%)." She then asked him "what is [your wife] going to say" when she is informed that you did not pass the polygraph.

As the suppression court acknowledged, appellant was probably not "sophisticated" enough to know that the polygraph exam would not be admissible as evidence against him, an observation that we think can fairly be extended to most suspects who are neither lawyers nor police officers, "sophisticated" or not. When confronted with Detective Carvajal's relentless and accusatory questioning, a reasonable person in appellant's situation—having been told repeatedly that he did not "pass" a polygraph and was, therefore, lying to the police about having molested a child—would, in the words of this Court, "understand that his freedom of action is restricted to a degree associated with formal arrest." *Thomas,* 202 Md.App. at 567, 33 A.3d 494.

Although our appellate courts have not addressed the impact of being confronted with the negative results of a polygraph test during an interrogation at a police station, the appellate courts of other states have. For example, in *People v. Algien,* 180 Colo. 1, 501 P.2d 468 (1972), a security guard of an apartment complex under construction, which was completely destroyed by fire, was given a "lie detector test," focusing on his potential involvement in that fire. *Id.* at 469. The investigating officers suggested that the security guards in charge of watching the complex "be given lie detector tests," and the owner of the security service employed by the complex requested that they do so. *Id.*

One of the security guards and eventual suspect, Algien, initially agreed to take the test but then changed his mind.

*Id.* But, after his employer made it clear that his job would be in jeopardy if he did not take the test, he agreed to do so. *Id.* at 469–70.

When the officer who administered the test confronted Algien with the results, which "indicated that [he] was untruthful," he confessed, after a lengthy discussion, to burning down the complex. *Id.* Only then was he informed of his rights, after which he signed a written confession. *Id.*

The Colorado Supreme Court affirmed the trial court's suppression of the statement on the grounds that, once Algien was told by the officer that he was not telling the truth, he "was significantly deprived of his freedom." *Id.* at 471. The Colorado state court considered the surrounding circumstances and stated:

> The test was given three times, and at the conclusion [Algien] was confronted with [the officer's] opinion that he was untruthful and that he had set the fire. Under such compelling circumstances, a reasonable person would with logic conclude that he could not leave the premises of his own free will but would be detained for formal arrest.

*Id.*

Here, as in *Algien,* appellant was given a polygraph examination and then confronted with the results, which were purportedly indicative of deception. Although, unlike Algien, appellant never outright confessed to the crime under investigation, he did admit to inappropriate touching when confronted repeatedly and unrelentingly by police with the polygraph results. Accordingly, just as Algien was influenced by the test results to change his story, the same appears to be true of appellant. As in *Algien,* when a suspect, in an interrogation, is pressed persistently with the polygraph test results indicating that he is "lying," "a reasonable person would with logic conclude that he could not leave the [police station] of his own free will but would be detained for formal arrest." *Id.*[16]

---

**16.** Subsequent to the briefing and oral argument in the instant case, the Supreme Court of Colorado reviewed a trial court's decision which had

Another case of interest is *State v. Sampson*, 808 P.2d 1100 (Utah Ct.App.1990). In that case, the Utah Court of Appeals reversed Sampson's conviction for second-degree murder, holding that inculpatory statements he made concerning the death of his daughter were the result of a custodial interrogation and were made without the benefit of the *Miranda* advisements. Sampson had initially claimed that his daughter had been kidnapped, but the police informed him that they did not believe his story and asked him to come to the police headquarters, the following morning, to take a polygraph exam. He agreed to do so. *Id.* at 1101.

The next morning, the polygraph examiner explained the process of and procedures for administering the test and gave Sampson the *Miranda* advisements, but the examiner did not obtain a valid waiver from Sampson of his right to counsel. *Id.* After administering the test, the polygraph examiner informed Sampson that the answer he gave to one question (which had been repeated, as part of a battery of questions, four times), that is, whether he knew where his daughter was hidden, appeared to be false. *Id.* 1102. Although continuing to deny that he knew anything, he suggested that his wife might. *Id.*

Thereafter, the polygraph examiner informed another officer about the results, stating that he believed that Sampson was being untruthful. He further advised the officer that

---

granted a motion to suppress inculpatory statements, made by a defendant after being confronted with a failed polygraph test and without benefit of *Miranda* advisements, based upon an application of *People v. Algien*, 180 Colo. 1, 501 P.2d 468 (1972). *People v. Pittman*, 284 P.3d 59 (Colo.2012). Although the *Pittman* Court reversed the lower court's grant of the suppression motion, it reached that conclusion because the lower court had "relied upon only one circumstance, not the totality of the circumstances, in determining that Pittman was in custody after the polygraph test." *Id.* at 61–62. The *Pittman* Court reaffirmed its previous holding in *Algien*, cautioning, however, that that decision had "analyzed multiple factors in determining that the suspect in that case was in custody," *Pittman*, 284 P.3d at 62, so too in the instant case, where we have considered the totality of the circumstances and not merely the one circumstance, to wit, the coercive use of the failed polygraph test results.

Sampson had been given the *Miranda* advisements. *Id.* That officer then took over the questioning of Sampson, but without giving him the *Miranda* advisements, relying instead on the polygraph examiner's assurance that he had already given Sampson those advisements. *Id.* During the ensuing interrogation, he informed Sampson that there were inconsistencies in his story and that he did not believe that Sampson was telling the truth. *Id.* Ultimately, Sampson "stated his daughter was dead and that he could show the police where she was located." *Id.*

On appeal, the Utah intermediate appellate court reversed the trial court, holding that that court had erred when it concluded that Sampson was not in custody when he made his inculpatory statements. The Utah appellate court declared that "two factors which conclusively tip[ped] the scale" in favor of custody were "the focus of the investigation" and "the form of the interrogation." *Id.* at 1105. The State "essentially concede[d]," the court pointed out, "that the investigation ... had focused exclusively on" Sampson and that police officers "had informed [Sampson] that they did not believe his story," *id.*, which together weigh in favor of a finding of custody. *See Buck, supra,* 181 Md.App. at 624, 956 A.2d 884 (observing that "one factor in assessing the existence of custody" is whether a suspect knows that he is "the focus of" police investigation).

And, as to the form of the interrogation, that is, whether the questioning was "investigatory" or "accusatory," the Utah court found that the questioning shifted in form from investigatory to accusatory and that that "weigh[ed] heavily in favor of a determination of custody." *Id.* The questioning became accusatory, the Utah court observed, once the officers learned that Sampson "had lied on the exam." *Id.* at 1106. The accusatory questioning, in conjunction with Sampson's knowledge of the suspicions of the police, followed by confrontation with the polygraph exam results, led the court to conclude that "a reasonable person in [Sampson's] position would not have considered himself free to leave at that time." *Id.* That conclusion, in conjunction with its finding that Sampson's

previous *Miranda* waiver was ineffective and that no advisements were given again following the polygraph examination, led the Utah intermediate appellate court to hold that Sampson's post-polygraph statements should have been suppressed. *Id.* at 1107.

As did Sampson, appellant spoke to the police the day before his inculpatory statements and agreed to go to the police station the next day to submit to a polygraph examination. And, as in Sampson's case, following that examination, the questions and statements of the police were nothing less than accusatory. Appellant was confronted with the unfavorable results of the exam and was repeatedly accused of lying by police. When appellant denied that there was any touching between himself and Angel, Detective Carvajal responded, "[Y]ou took this test, and you couldn't pass it, which says that you're lying, so, what do we do? How can we settle this?" Like Sampson's initial story, appellant's early version of events eventually shifted, ultimately resulting in inculpatory statements. But, unlike Sampson, appellant never had the benefit of *Miranda* advisements at any point during the investigation, either before or after the polygraph examination. Thus, the scales are tipped even more in favor of a finding of custody in the instant case than they were in *Sampson.*

We turn to a case—*State v. Godfrey*, 131 N.J.Super. 168, 172, 329 A.2d 75 (1974), *aff'd*, 67 N.J. 267, 337 A.2d 371 (1975) (per curiam)—whose facts are similar to those of the instant case. Godfrey, a suspect in a barroom murder, "learned through his girlfriend that the police wanted him to come to the police station, and he voluntarily did so." *Id.* When he arrived there, a detective "discussed the shooting" with him and persuaded him to submit to a polygraph test. He was then taken "to a different location in the building" where another police officer administered the test. *Id.* Before the test was administered, however, Godfrey was given a written consent form explaining his rights. Because Godfrey could not read, "a clerk was called in to explain" his rights, but the

explanation "did not include the warning that anything defendant said could be used against him." *Id.*

At the conclusion of the test, the detective administering the polygraph test informed Godfrey "that the test results indicated that he had lied during the administration of the polygraph test; that he was present at the time of the shooting[;] and that he was the one who did the shooting." *Id.* at 173, 329 A.2d 75. Godfrey denied that he was present at the crime scene or that he had killed the victim, but the detective "continued to confront" him with the test results, and he "finally confessed to the shooting." *Id.* The detective "immediately summoned" another officer, who then administered *Miranda* advisements, re-interrogated Godfrey, and obtained a written confession. *Id.* When the matter was brought to trial, the trial court granted Godfrey's motion to suppress his confession.

The New Jersey intermediate appellate court affirmed that ruling, holding that Godfrey was in custody when he made his statement to the polygraph operator. In rejecting the State's contention that Godfrey "voluntarily appeared at the police station, was not placed under arrest, was free to leave before taking the polygraph test and free to leave after the conclusion of it," *id.* at 175, 329 A.2d 75, the court explained:

> It cannot be seriously argued that after the police had administered a polygraph test to defendant, and as a result thereof were in possession of information indicating to them that (1) defendant had lied to them, (2) defendant was present at the shooting and (3) defendant was actually the man who shot [the victim], they would have permitted him to walk from the inner office where he had been placed by [a detective] and out of the police station. Statements by the detectives to that effect are incredible and not worthy of belief.

*Id.* at 177, 329 A.2d 75.

The factual similarities between *Godfrey* and the instant case are compelling. Like Godfrey, appellant was suspected of having committed a specific offense and was, as a conse-

quence, asked to take a polygraph test to be administered at a police station. At the conclusion of that examination, he was told that he had lied and had flunked the test. When appellant denied the accusations, the interrogating detective persisted in confronting him with the test results, and appellant ultimately gave an incriminating statement. And finally, as in Godfrey's case, the State contends that appellant voluntarily went to the police station, was not placed under arrest, and was free to leave both before and after taking the polygraph test, 131 N.J.Super. at 175, 329 A.2d 75, but, as in that case, statements "to that effect are incredible and not worthy of belief." *Id.* at 177, 329 A.2d 75. We conclude, as did the New Jersey intermediate appellate court under the circumstances of *Godfrey*, that appellant was in custody during the post-polygraph interrogation.

Given the totality of the circumstances, we hold that, when Detective Carvajal confronted appellant with his purported failure to pass the polygraph examination, which she described as "almost (100%) correct," repeatedly accused him of lying, and then questioned him without letup in an aggressive, persistent, and accusatory manner, his interrogation was custodial, as, under such circumstances, a reasonable person would have understood that his freedom of action was restricted to a degree associated with formal arrest, *State v. Thomas*, *supra*, 202 Md.App. at 567, 33 A.3d 494 and hence, he should have been given the *Miranda* advisements. Because appellant was never given those advisements, the suppression court erred in denying his motion to suppress the November 3rd statements. Accordingly, we reverse appellant's convictions and remand for further proceedings.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MONTGOMERY COUNTY.**