Filed 7/14/15

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D067411 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVA1100130) |
| JOEL RODRIGUEZ MORALES, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Bernardino County, Stephen A. Mapes, Judge.  Reversed with directions.


Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric Swenson and Ryan H. Peeck, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Joel Rodriguez Morales guilty of second degree murder (Pen. Code,[1] § 187, subd. (a)) and found true the allegation that he personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)).  The court sentenced defendant to 15 years to life in prison consecutive with the one-year enhancement.

On appeal, defendant contends a police station interview turned custodial when officers pre-*Miranda*[2] repeatedly accused defendant—the prime suspect in the homicide—of lying and being deceitful, after informing defendant he failed a polygraph test.  Defendant further contends the officers' subsequent midstream *Miranda* advisement was ineffective because his statements pre-*Miranda*, including that he and the victim argued over money, they got angry and came to "blows," were coerced, and thus all of his post-*Miranda* statements made during the same interview also should have been excluded.

Defendant next contends the courthouse statements he made four days later, when he was contacted shortly before his arraignment by one of the officers involved in the police station interview and further questioned about the victim's homicide, also should have been excluded because the initial *Miranda* advisement at the station was ineffective and because the officer did not then re-advise defendant of his *Miranda* rights.

As we explain, we independently conclude from the totality of the circumstances that after defendant took *and* (allegedly) failed the polygraph test, a reasonable person in

---

1    Unless otherwise noted, all further statutory references are to the Penal Code.

2    *Miranda v. Arizona* (1966) 384 U.S. 436.

defendant's position would surmise that he or she was *not* free to leave the station. The record shows the police then pre-*Miranda* (1) aggressively and repeatedly accused him of lying about his lack of knowledge or involvement in the homicide; (2) told defendant to "sit down," "listen" and "understand" that they did not have defendant at the station merely to have him there but already knew he was involved in the homicide because they had the answers to the myriad questions they were repeatedly asking him; and (3) continued after the (allegedly) failed polygraph test to question defendant in an increasingly aggressive, confrontational and accusatory manner, which interrogation ultimately led to defendant's statement he and the victim argued over money and came to "blows."

We also independently conclude there is no substantial evidence to support the finding defendant's statements at the police station post-*Miranda* were uncoerced or were otherwise the product of his own free will. (See *Oregon v. Elstad* (1985) 470 U.S. 298, 307 (*Elstad*).) As such, we conclude the post-*Miranda* statements made by defendant at the police station also should have been suppressed as the product or "fruit" of the officers' coercive interrogation.

In light of our conclusion that the police subjected defendant to custodial interrogation in violation of *Miranda* when they questioned him for several hours at the police station, we also independently conclude the courthouse statements defendant made to the police four days later should have been suppressed as the product of such violation, as the record shows defendant was not given an additional *Miranda* advisement before questioning resumed.

Finally, we conclude the error in failing to exclude defendant's stationhouse and courthouse statements was not harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). We thus reverse defendant's conviction and remand the matter to the trial court with directions to vacate its order denying defendant's motion to suppress and to issue a new order granting that motion.

FACTUAL AND PROCEDURAL OVERVIEW

Nelson Rizo testified he and victim Jesus Trejo lived as roommates for about two years in an apartment in Fontana. Trejo drove a red convertible Mustang. According to Rizo, Trejo never gave others permission to drive his car.

On Friday morning, January 14, 2011, Rizo left the apartment to go to work. Rizo did not return to the apartment until about 6:00 or 7:00 a.m. the following Monday, as sometimes he stayed the night at work. Rizo reported that sometimes defendant also stayed the night at their apartment.

When Rizo came home on the morning of January 17, he found the victim's car missing and the victim's bedroom door locked. Later that day, Rizo cleaned the apartment after he smelled a foul odor. The next day, the odor got worse. Rizo called his friend "Martin" looking for defendant, in an attempt to locate the victim. Martin told Rizo he saw defendant driving the victim's car. After learning defendant was driving the victim's car, Rizo became concerned and decided he needed to open the victim's bedroom door.

Martin Ramos testified he knew the victim and Rizo were roommates. Ramos saw defendant driving the victim's car on January 17. According to Ramos, defendant drove the victim's car to visit Ramos's roommate, Abel Perez.

4

Perez testified he saw defendant driving the victim's car about 12:30 p.m. on Friday, January 14 and again on Monday, January 17. According to Perez, defendant did not look or appear injured on either occasion. Perez also saw defendant with the victim's cell phone, which defendant used to call Perez. When Perez asked defendant why he had the victim's car, defendant said the police had arrested the victim and had left the victim's car with defendant.

Anthony Canales testified he owned the apartment where the victim resided. Canales received a phone call from Rizo about an odor in the apartment. Canales went to the apartment, spoke with Rizo and they called police. When police arrived, they instructed Canales to call a locksmith to open the victim's locked bedroom door.

San Bernardino County Deputy Sheriff Charles Nichols testified he was dispatched to an apartment building mid-morning on January 18, where he met the building's owner, Canales. Nichols testified he was standing about 30 or 40 feet from the building when he smelled an odor that was clearly coming from inside the building. After the locksmith opened the victim's bedroom door, Nichols and another deputy went inside and found the victim deceased. The victim was located just inside the doorway, at the base of the bed, and was "covered in blankets."

Homicide Detective Neal Rodriguez testified he and others performed a walk-through of the victim's apartment and although the apartment was "dirty," initially the detectives found nothing "out of place" and nothing in the apartment itself suggesting there had been "any sort of physical fight or altercation" involving the victim. Rodriguez saw blood in the victim's room, near the victim's body. Otherwise, Rodriguez did not see

5

any blood smears; blood splatter; "drag," "kicking," or "scuffing" marks; or other indicia typical of a struggle.

Rodriguez saw a two-liter soft drink bottle on the floor near a coffee table. He also saw a sectional of the couch separated in the living room, coins and clothes all over the living room floor, and possible blood stains on the living room ceiling. Rodriguez found the victim inside his room, in a decomposed state. The victim was wrapped in a blood-soaked blanket with a USB cord tied around his neck. They also found clothes with what appeared to be blood stains. Once the blankets were removed, police found evidence of blunt force trauma to the victim's chest and head. Rodriguez noted everything in the victim's room appeared to be "in place," suggesting there also was no prolonged physical altercation or violence in that room.

A few days later, based on additional information (discussed *post*), Rodriguez and Detective Armando Castillo, Jr. (one of the officers who conducted the stationhouse interview of defendant, as also discussed *post*), returned to the victim's apartment and found a large and "heavy" stick underneath some curtains. There appeared to be dried blood on one end of the stick.

Homicide Detective Jose Avila testified he participated in the January 20, 2011 stationhouse interview of defendant. According to Avila, that interview was in Spanish and was primarily conducted by Castillo. The interview was videotaped and was played for the jury.[3] The record shows the jury also heard an audio recording of a subsequent

---

[3]    The record shows before the recording was played, the jury was instructed that the evidence was *not* the Spanish being spoken in the recording, but rather the English transcript of the interview that the jurors were each given while watching the video. The jury was also instructed that even if a juror understood Spanish, it was important that all

conversation between Castillo and defendant (also discussed *post*), which took place four days after the stationhouse interview.[4]

Forensic pathologist Frank Sheridan testified the victim had been dead "some time" when he was found by the officers. Dr. Sheridan opined the victim died of blunt force trauma likely caused by repeated blows of considerable force to the head. During the autopsy, Dr. Sheridan found the presence of a number of injuries to the victim's head: "There were indications of impacts to the head, and the left side of the head particularly was especially badly damaged with the extensive fracturing of the skull on the left side and some underlying -- smaller underlying hemorrhage inside the vault of the scalp." Dr. Sheridan also found lacerations to the victim's head and bone fragments in the victim's brain, both of which were consistent with blunt force trauma.

With respect to the USB cable wrapped around the victim's neck, Dr. Sheridan noted the cord was tied in a "bow-type knot." Dr. Sheridan opined the cord had nothing to do with the victim's death, as Dr. Sheridan found no internal injury to the neck region. Dr. Sheridan thus ruled out strangulation as the cause of death of the victim.

Dr. Sheridan opined that given the extensive trauma to both sides of the victim's head, the victim likely became unconscious "fairly quickly"; and that once the skull

<hr>

jurors consider the *same* evidence, and thus the jury was to accept the interpreter's translation and was to disregard any different meanings. Finally, the jury was instructed that the detectives' statements were only to be considered for the limited purpose of understanding defendant's responses to their questions. The record shows that at the end of the interview, the jurors returned the transcripts.

[4] The record shows the jury again received an English transcript of the Spanish recording. The record also shows the court reminded the jury of its previous instructions regarding the recording/transcript and the limited purpose of the detectives' questions.

became fractured and was no longer protecting the victim's brain, the brain would begin to swell and cause the victim to die as it cut off the respiratory center in the brain. Dr. Sheridan opined the victim likely died within "minutes" from the blows to his head. Dr. Sheridan also saw no evidence of any "defensive wounds" on the victim, such as to the victim's hands or forearms that might be expected if the victim had attempted to block any blows by his attacker. Dr. Sheridan pointed out, however, that the decomposition of the victim's body may have been a "factor" in the lack of any evidence of such wounds.

## DISCUSSION

As noted, defendant claims he was in custody for *Miranda* purposes at the latest when he was repeatedly told by officers that the results of his polygraph test showed he was lying about his knowledge of and involvement in the victim's murder.

A. Additional Factual Background

1. *The Police Station Interview*

In connection with defendant's pretrial motion to suppress, Castillo testified that defendant was a "person of interest" when police contacted him on January 20. Defendant became a person of interest on January 18, "several hours" after police found the victim's body. Police also prepared a "press release" identifying defendant as a "suspect" in the homicide.

Before police contacted defendant on January 20, they already knew defendant was in possession of the victim's cell phone, was driving the victim's red convertible Mustang and was the victim's occasional roommate.

Once defendant was contacted at a truck yard where he worked, Castillo instructed at least five plain-clothes detectives to "'stand with [defendant]'" until Castillo arrived.

8

Castillo recorded the contact. In response to defendant's question why police were "looking" for him, Castillo told defendant they wanted to talk to him "about a problem" and asked if defendant would be willing to go to the police station "to talk real quick." Castillo told defendant he was not arrested or being detained. Defendant agreed.

Defendant rode in the front seat of Castillo's car during the 20 mile or so drive to the stationhouse. Defendant was not handcuffed. On the way, they talked about each other's family in Mexico among other subject matters, all of which were unrelated to the homicide. Defendant admitted he previously had been arrested for drunkenness.

Once at the station, defendant was placed in an interview room and was offered something to drink and eat. Castillo, joined by Detective Avila, reiterated that defendant was neither under arrest nor being detained and that "[i]f at any moment [he did] not want to speak with [the detectives, he could] leave." Defendant asked Castillo why they were looking for him and what was he being accused of. Castillo did not answer either question.

The record shows Castillo initially asked defendant general background questions. At some point, Castillo asked defendant if he worked at a carwash with the victim. Defendant denied working with the victim but stated he sometimes went to the victim's apartment to hang out and play cards. Defendant referred to the victim as his "best friend" and stated he sometimes stayed the night at the victim's apartment.

On questioning, defendant denied driving the victim's car. Castillo told defendant that witnesses had seen defendant driving the victim's car over the weekend. Defendant in response changed his story and said the car belonged to an individual named "Jorge

9

Rodriquez." When Castillo reiterated it was the victim's car, defendant said that the victim and Jorge had been arguing over the car and that the victim left the car to Jorge.

When confronted by Castillo that the previous Saturday defendant had told Abel a different story about how he came into possession of the victim's car, defendant denied lying and said he went to the victim's house on Sunday morning and found the front door open. Defendant claimed that he found the victim's cell phone inside the apartment, near the front door; that when he went inside, nobody appeared to be home; and that he believed somebody had been in the victim's apartment at some point that day because when defendant went back to the apartment later that day, the front door was closed. Defendant also volunteered that Rizo and the victim were arguing over money Rizo allegedly owed the victim.

Defendant told the detectives that he last saw the victim on the previous Tuesday or Wednesday, around noon; that on Saturday afternoon, he met Jorge in front of a liquor store and Jorge lent defendant the red Mustang; and that Jorge told defendant that Jorge had bought the car from the victim, but the victim did not want to turn the car over.

Defendant also told detectives he went to the victim's apartment two days earlier and knocked on defendant's bedroom door, but nobody answered. Castillo responded that they found the victim dead *and* that defendant was not telling the truth. When defendant denied lying, Castillo asked defendant to take a "lie detector" or "[p]olygraph" test in order to disqualify defendant as a subject of their investigation. Castillo explained the test after defendant said he had never heard of such a test or machine. Defendant agreed to take the test.

10

## 2. *The Polygraph Test*

The polygraph test was conducted at the stationhouse by Examiner Heard.[5]  After briefly explaining the test, Heard informed defendant he was not being forced to take the test and he could say he did not want to take it.  After learning that defendant had been arrested, deported to Mexico and returned illegally, Heard informed defendant it was important for defendant to tell "the truth, the pure truth," and that if defendant did not tell the truth, there was no reason to take the test "because it will be wrong."

Defendant told Heard that he helped the victim at work "once or twice"; that he walked to the victim's apartment on a Tuesday the week before; that he stayed at the victim's apartment about eight days just before Christmas; that the victim and Jorge argued over the car; and that Rizo owed the victim two months' rent.

Heard next repeated several questions, including asking defendant about the car and his last contact with the victim.  At some point, defendant started asking about the lie detector machine.  Heard in response said the machine looked into a person's heart and brain and indicated when someone was not telling the truth because a person "relive[s] a lie."

Before Heard administered the lie detector test, he reviewed the questions defendant would be asked and informed defendant he would have to take the test three times in order to obtain accurate results.  Heard also reminded defendant he did not have to take the test and he was a "free man right *now*."  (Italics added.)  Defendant in response noted that if he did not take the test, "they'll [i.e., the police] say I'm lying."

---

5      The parties agree the record incorrectly identifies Castillo as the operator of the polygraph when in fact it was Heard who conducted the test.

11

Heard then asked defendant a series of questions three separate times, including whether defendant caused one or more of the victim's injuries that led to the victim's death.  At the conclusion of the third and final exam, Heard told defendant the tests were "not turning out well."  The record shows the following exchange then took place between Heard and defendant:

"[Heard]:  It's not turning out well.  Because when you say you did not do anything to Jesus [i.e., the victim], it's not turning out well.  What are you thinking about?  If I can, I can change the questions.  The truth is there in your heart, but it's still not on the table.  I'm going to get a piece of paper and we're going to start again.  Tell me again, all I want is the truth.

"[Defendant]:  That's the truth.

"[Heard]:  No, no, the truth is still missing.  It's possible that the majority of what you have told me is the truth.  But there are a few things that are missing.  Don't get scared okay?  *Sit down.  Listen to me.  Don't tell me you didn't do anything to Jesus, that won't slide*.  What happened to Jesus, and I'll change the questions.

"[Defendant]:  Okay, but that's the truth.

"[Heard]:  It's possible that a good deal of what you've told me is the truth.  But the truth about what happened to Jesus is still missing; it's in your heart.  Do you understand?  *I'm not playing*.

"[Defendant]:  No, no, neither am I.

"[Heard]:  What is important is that you tell me the truth.  Are you scared of somebody?

"[Defendant]:  No.

12

"[Heard]:  So tell me what happened?

"[Defendant]:  I already told you.

"[Heard]:  No from what you have told me, the truth is missing about what happened to Jesus.  Do you understand?  *Look at me*.

"[Defendant]:  Yes.

"[Heard]: It's possible that something happened to Jesus, it's possible that it was an accident; it's possible that he was angry or you were angry and something happened.  I wasn't there.  But you took the test and it's not turning out well.  If I can, I can change the questions *but you have to tell me the truth about everything that happened, do you understand*?

"[Defendant]:  Yes, I understand you.

"[Heard]:  The truth is missing.  It's very important that the truth come out.  Where do you want to start?  Because there are things that are in your heart that still are not written down on this paper.  You *have to tell me what the truth is because you have a problem here.  When it comes out of here, everything will go well.*  But it turned out badly because there are still things in your heart that are missing about Jesus [Trejo].  What's missing?

"[Defendant]:  It's the truth.

"[Heard]:  *No, no, no.  I don't want to he[ar] the same things*.  I want to hear what is missing.  There are things that are missing.  The truth is missing.  It's important that you tell me the truth about Jesus [Trejo].

"[Defendant]:  I'm telling you the truth.

13

"[Heard]: *No, no. You still haven't told me all the truth.* There are things that are missing. Do you understand me when I tell you that there are many things that you have told me that may be true, they may be. But the truth about what happened to Jesus [Trejo], you still have not told me. So what is missing about what happened to Jesus [Trejo]?

"[Defendant]: I'm telling you the truth.

"[Heard]: *No, no, no. Don't tell me that again, do you understand me*? What I want to hear is what is missing. *I don't want to hear the same, the same, the same, again, again, again. There are things that are missing and you need to help yourself.* You. Tell me what's missing. And if I can, I will change the questions. When you told me that you did not do anything to Jesus [Trejo], *it's a lie. It's a lie.* Tell me the truth. It can still be an accident. Or it is possible that you saw something. If you want to tell me, 'I did not do anything to Jesus' but you were there when someone was hitting him or something, that could be the problem, I don't know. *But if you leave it at this, I have to tell the detectives that you did not pass the exam.* So just tell me the truth, tell me what happened. What happened? Don't be scared.

"[Defendant]: I'm telling you the truth.

"[Heard]: What is missing?

"[Defendant]: No, it's what I just told you.

"[Heard]: *That doesn't slide.* There are things that are missing. *You know that there are things that are missing and I do too.* Listen, are you scared of somebody? You went to his house and something happened with other people who were there or what?

14

"[Defendant]:  No, because I would have told the police.  I don't have a telephone or anything but I would've told them I needed a telephone and they would have given me it.

"[Heard]:  You want to leave things at that?

"[Defendant]:  What more do you want me to tell you?

"[Heard]:  The truth.

"[Defendant]:  Well that's the truth.

"[Heard]:  The truth is still missing.

"[Defendant]:  I don't know what you want me to get out of myself but I did not do anything.  What I'm telling you is it.

"[Heard]:  No.  There are things missing . . . .  And what's missing is in your heart. [¶] . . . [¶]  . . . If you were the one who killed him, it could still be an accident.  If he was mad and wanted to hit you, you have the right in this country to defend yourself.  You have the right to fight, to get something to help you because you are scared.  If you and he were in [a] fight, who would win?  He or you?

"[Defendant]:  Well, he would.

"[Heard]:  Well if this is the truth, and he is stronger or bigger than you. . . [.] Bigger, okay.  Well if he was upset and wanted to hit you, you have the right in this country and I think in Mexico too, to defend yourself.  Grab something, whatever you choose to defend yourself.  Because if someone wants to hit you, you have the right to do something.  Now, I don't know what happened because I was not there.  *All I know is that something happened, you and him.  Because this* [i.e., the polygraph] *tells me that*.  But I do not know if it was an accident or it is impossible [*sic*] that it was something that is not

15

criminal, or it could be something criminal. *But if you leave it at that, you are not helping yourself. You need to help yourself.*

"[Defendant]: I'm helping myself.

"[Heard]: No, no you're not. If you want to leave it at this then I'll call the detectives if you want to leave it at this. Do you want to leave it at this?

"[Defendant]: If there's no other alternative then. . . [.] I'm telling you the truth. And if you think that it was me or. . . [.]

"[Heard]: Honestly, I'm not sure. I'm not sure what happened. The only thing I'm sure about is that the truth is still missing. I'm not sure what happened. *I'm sure that you do know what happened.*

"[Defendant]: No. [¶] . . . [¶]

"[Heard]: I have to speak with the detectives. But what I want you to do is think about where you want to be tomorrow, or next week or next month. Because this is a pretty difficult case, someone died. And if the truth is that you did not do it, but you do know who did it, the truth will come out.

"[Defendant]: The truth has to come out and like I said. . . [.]

"[Heard]: Understand Joel, *I think that you did something.* I am not sure how it happened *but I'm sure that you do know what happened.* I don't know if it was [an] accident, I do not know if you were playing, I do not know if you were angry. *But I'm sure, sure that the truth about this is in your heart and that you do know and that it is still not here, it did not come out. You have not told me it.* You have told me many things that are true. But the truth about what happened to Jesus is still missing. I'm going to call the detectives." (Italics added.)

16

The record shows Castillo came into the polygraph examination room and told defendant the following: "Frankly I have a lot of time doing this job. And when the machine shows that something is happening here, *and frankly when the machine alerts us that something is not coming out well, it is because you are hiding something*. And I have eighteen years doing this type of job, do you understand? Look, you will not be the first or the last to want to hide something because of being scared or thinking what the consequences could be of what I say or what I got involved in. But what I want to tell you, what I want to let you know is that there are different reasons for which things happen. If a person was defending himself, if a person was scared, if it was an argument and accidently you do something and someone was hit. Things like that happen. There are different circumstances that exist when things happen. And you shouldn't be scared because what we want to do is resolve the problem we have here.

"[Defendant]: I would tell you.

"[Castillo]: Something is wrong here. *If he* [i.e., Heard] *tells me that something is wrong here, something is not right here. And because of that we have to know the truth. Should you be scared? Yes, why not? I too would be, if the police came to speak with me, then I would have a little problem wouldn't I*?

"[Defendant]: Yes, but I'm not scared, I'm telling you the truth. This is the truth. The truth is that I'm a hardworking man.

"[Castillo]: Let's look at everything that is happening here. . . . *There are a few things that you told me in our initial talk that were untrue. And I know because I have spoken with ten different people. And for that reason I want to make you understand that something is not right.*

17

"[Defendant]: Okay.

"[Castillo]: Do you understand me? And for that reason, I want to make you understand. I am not here to make judgments; I just want to know the truth. And something is not right. . . . Joel, there are errors that we make in our life and sometimes things happen. I understand that. *But if you are not telling us the whole truth or if you are leaving out parts of this story that you should tell us and you are not telling us, then we will think the worst.* We will think, something is not right here because he does not want to tell us the whole truth. I think that you are a hardworking man who wants to progress and continue forward, but we have a little problem here. And for that reason I tell you, tell us what happened. That is the most important thing. And I say that you know more and if there was a misunderstanding that you did not tell us all about, now is the time to correct that.

"[Defendant]: Yes, I understand you. But. . . [.]

"[Castillo]: Look, I know in your heart you feel bad about what happened. I already know it. Because I can see in your face that you are a man who loves people, other people are important to you; *it was an error that you committed. It was just an error, I already know. But if you don't explain it to me, we are going to think that it was something that you planned, that you wanted to do.* And you cannot leave me with that doubt, that's why I am telling you, something happened.

"[Defendant]: Well regardless what can I tell you?

"[Castillo]: With the truth.

"[Defendant]: I know with the truth, but regardless you are taking me to jail.

18

"[Castillo]:  Are you detained?  I told you that you are not detained.  If you want to leave, you can leave.  I just want to know the truth Joel.

"[Defendant]:  Okay I will tell you the truth.  If because of what I'm telling you and regardless you are taking me to jail, I have to come to court to argue my case.  Because of that, what else can I tell you?  That is what I know.  So if you have to take what you have to take, just lock me up and. . . [.]

"[Castillo]:  Have I said that I am going to lock you up?

"[Defendant]:  No, no.

"[Castillo]:  What have I told you all day?

"[Defendant]:  I know but you are saying that I am not telling you the truth.

"[Castillo]:  What I am saying is something is missing.  All I have said is that you need to tell me the truth.

"[Defendant]:  I also have the right to make a phone call now.  If you take me to jail, you have that right.  But I also have the right to my day in court.

"[Castillo]:  If a mother is going to bury her child, I spoke with that mother. [¶] . . . [¶]  She told me that if it was an accident, it was an accident and I forgive the man who did that.  That is what she said.  *And I am telling you Joel, the machine does not lie*.  Something is missing here and you know that there is something missing, Joel.  *There is something missing and we are going to talk about that.  Let's go over here.*"  (Italics added.)

3.  *Police Resume Questioning of Defendant*

The record shows the police moved defendant back into an interview room and resumed questioning him.  The trial court noted that when the questioning resumed, the

19

video showed the two detectives sat between defendant and the door.[6] The trial court also noted that Avila "two or three times" grabbed Castillo's "*Miranda* rights advisal form that was attached to Detective Castillo's hip . . . before Detective Castillo actually read the rights." (Italics added.)

Castillo told defendant they knew he was lying because Abel told police that defendant had the victim's car *and* cell phone on Saturday; that Abel reported defendant on Saturday had said the police arrested the victim and, as a result, the victim gave the defendant his car key and cell phone for safekeeping; that police had the phone records for the victim's cell phone and it showed calls were made from that phone on "Saturday, Sunday, Monday and Tuesday, today and yesterday"; that defendant could not have gone to the victim's apartment on Tuesday, as defendant earlier stated, because the police were there investigating the victim's death; that witnesses saw defendant leave the victim's red Mustang on a street; and that surveillance video from a store located adjacent to the victim's apartment showed defendant taking the victim's car not from a liquor store, as defendant had earlier stated, but instead from the parking lot of the victim's apartment.

Castillo told defendant he was not getting a "good vibe" from defendant and asked defendant rhetorically, "Why do we have this problem?" Castillo stated he was giving defendant the opportunity to tell the truth and noted defendant was not availing himself of that opportunity. When defendant continued to deny any knowledge or involvement in the homicide, Castillo told him, "I want to know, what I want to know is this Joel, this is what I want to know. . . [.] [¶] . . . [¶] Because, the small problem I have is this.

---

6 The video of the interrogation was not included in the appellate record.

[¶] . . . [¶]  You understand why I have doubt right?  [¶] . . . [¶]  Because you have given me different stories."

As defendant continued to deny any involvement, the record shows Castillo continued to point out the inconsistencies in defendant's stories, repeatedly accused defendant of lying and told defendant, "*Listen the questions that I am asking you, I already know the answer to.  I don't have you here just to have you here*."  (Italics added.)

The record further shows after defendant continued to deny he took the car from the victim's apartment, Castillo asked defendant if he had a heart and reiterated that the store surveillance video would show defendant took the victim's car from the victim's apartment.  In response, defendant stated he went over to the victim's apartment, they began to argue over money and, after the victim would not let defendant make himself something to eat, they went to "blows."

The record shows after several hours of questioning and after defendant admitted he and the victim went to "blows," Castillo for the *first* time gave defendant the *Miranda* advisement.  The record further shows defendant thereafter was extensively questioned by the detectives.  Defendant stated he was acting in self-defense when he struck the victim multiple times in the head and neck with a heavy stick, after the victim threw a two-liter bottle at him, came at him and attempted to hit him with a 40-pound weight.  Defendant admitted tying the cord around the victim's neck to make it appear the victim committed suicide and said he left the weight by the front door.

4.  *The Courthouse Interview*

The record shows Castillo questioned defendant four days later, before defendant's arraignment.  Their conversation was recorded.  Castillo told defendant he wanted to

21

speak with him "real quick." Castillo asked defendant if he "remember[ed] what [Castillo] told [him]," if it was "okay to talk with [Castillo] again" and suggested defendant "come over here please, of, regarding the rights that I told you, right?" Castillo then said, "And are we good, willing to talk?" Castillo did *not*, however, give defendant another *Miranda* advisement.

Defendant told Castillo the victim never tried to hit defendant with a weight. Instead, they argued in the kitchen when defendant was making "eggs" in a pan with hot oil. After the victim pushed defendant into the stove, defendant said they got "into it" and he got angry. Defendant then apologized and expressed regret for the crime.

5. *The Trial Court Denies the Motion to Suppress*

The trial court ruled defendant's pre- and post-polygraph statements at the stationhouse were admissible. Specifically, the court found defendant was not in custody when he was "picked up" and driven to the police station. It further found that defendant voluntarily took the polygraph and that there was a "tremendous amount of voluntariness on the defendant's part."

The court noted, however, the situation changed after the polygraph: "You know, I don't know if I buy that . . . he's really free to leave or not because, in my mind, if it were me, there's no way that [defendant] would be leaving from the station house once he failed the polygraph. He [i.e., Castillo] would keep him [i.e., defendant] there until he got the confession. [¶] . . . [¶] So that makes it an overall objective situational custody of [defendant]. Not 100 percent in my mind even though I could certainly see somebody not feeling free to leave in that situation. Certainly there's some psychological things going on at this point."

22

Despite the trial court's observations and statements, the record shows the court nonetheless denied defendant's motion to suppress, ruling: "So I'm not going to suppress the defendant's confession at that time -- I know what I was going to say -- the test in my mind was the -- was the *Miranda* waiver effective. Was it deprived of its effectiveness at the time it was given because of what happened before. My factual finding based on everything I heard and the totality of the circumstances is it was an effective warning. So that part of the motion is denied."[7] (Italics added.)

The record further shows the court tentatively ruled to suppress the statements defendant made at the courthouse four days later. After further briefing of the parties, however, the court changed its tentative decision and found the courthouse interview was "reasonably contemporaneous" with the *Miranda* advisal Castillo had given defendant at the stationhouse four days earlier. In making this finding, the court noted Castillo was the same detective who previously interviewed defendant; Castillo and defendant had an "interrogational relationship"; and Castillo generally reminded defendant of his rights. The court also noted defendant appeared to want to talk to Castillo during the courthouse interview because defendant was remorseful for what he had done.

B. Guiding Principles

A criminal suspect's statements to police during a custodial interrogation will be excluded under *Miranda* if the suspect is not first advised of specific Fifth Amendment rights. (*People v. Thornton* (2007) 41 Cal.4th 391, 432; *People v. Whitfield* (1996) 46

---

[7]  Although the court found the *Miranda* waiver was effective, it does not appear the court ever ruled on whether defendant was subject to custodial interrogation *before* he was *Mirandized.*

Cal.App.4th 947, 953.) For *Miranda* to apply, "'the suspect must be in "custody," and the questioning must meet the legal definition of "interrogation."'" (*Whitfield*, at p. 953.) "The prosecution has the burden of proving that a custodial interrogation did not take place." (*Ibid.*)

Here, there is no dispute defendant was interrogated for purposes of *Miranda*. (See *People v. Johnson* (1992) 3 Cal.4th 1183, 1224 [noting "[i]nterrogation consists of express questioning or of words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response"].) Rather, the key issue here is whether defendant was in custody when he made statements to police pre-*Miranda*, including that he went to the victim's apartment, he and the victim argued and they went to "blows." An individual is in custody for the purposes of *Miranda* if he or she is "deprived of his [or her] freedom in any significant way or is led to believe, as a reasonable person, that he [or she] is so deprived." (*People v. Taylor* (1986) 178 Cal.App.3d 217, 225.)

Determining whether a defendant is in custody is based on the "objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323.) "'[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances.'" (*People v. Linton* (2013) 56 Cal.4th 1146, 1167.) A person is in custody if he or she feels they cannot end the interrogation and leave. (*Howes v. Fields* (2012) ___ U.S. ___ [132 S.Ct. 1181, 1189–1190].) "Unfortunately, the task of defining 'custody' is a slippery one, and 'policemen

24

investigating serious crimes [cannot realistically be expected to] make no errors whatsoever.'"  (*Elstad*, *supra*, 470 U.S. at p. 309.)

The court in *People v. Aguilera* (1996) 51 Cal.App.4th 1151 (*Aguilera*) set forth some of the circumstances relevant to determining whether a defendant was in custody for the purposes of *Miranda*:  "Among them are whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation."  (*Id.* at p. 1162.)  "No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest."  (*Ibid.*)

"'Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact.  [Citation.]  When reviewing a trial court's determination that a defendant

25

did not undergo custodial interrogation, an appellate court must "apply a deferential substantial evidence standard" [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, "a reasonable person in [the] defendant's position would have felt free to end the questioning and leave."'" (*People v. Moore* (2011) 51 Cal.4th 386, 395 (*Moore*); see *People v. Johnson* (1993) 6 Cal.4th 1, 25 [noting a court of review "'must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported,'" but further noting a court of review "'must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained'"], overruled on another ground as stated in *People v. Rogers* (2006) 39 Cal.4th 826, 879.)

C.  Analysis

1.  *Suppression of Defendant's Stationhouse and Courthouse Statements*

The parties dispute whether defendant was in custody before he was given his *Miranda* advisement.  As discussed, there are many circumstances that a court may consider in determining whether an individual is in custody.  (See, e.g., *Aguilera*, *supra,* 51 Cal.App.4th at p. 1162.)  In analyzing this issue, we examine in sequence the various circumstances pre- and post-*Miranda* that took place from defendant's initial contact with police in the truck yard up to the time defendant was formally arrested.  (See *Moore*, *supra*, 51 Cal.4th at p. 395 [examining "in sequence each of the three sets of statements defendant claims should have been excluded" under *Miranda*].)

Here, focusing on the totality of the circumstances and considering how a reasonable person in defendant's situation would perceive his situation (see *People v.*

26

*Linton*, *supra*, 56 Cal.4th at p. 1167), we conclude there is substantial evidence in the record to support the finding that defendant was *not* in custody when he was first contacted at his place of employment. Although the record shows defendant was a "person of interest" and there were at least five plain-clothes officers "standing" near a car with defendant when Castillo arrived on the scene, the record also shows that defendant was neither handcuffed nor searched by detectives (see *Moore*, *supra*, 51 Cal.4th at p. 396); that none of the detectives had their weapons drawn; that defendant freely agreed to go to the station to speak with Castillo, noting twice it was "not a problem"; and that before they left for the station, Castillo informed defendant he was not being detained or arrested but that Castillo just wanted to talk to defendant "real quick."

We thus independently conclude a reasonable person at this point would not perceive his or her circumstances to suggest he or she was being restrained to the degree associated with formal arrest. (See *Thompson v. Keohane* (1995) 516 U.S. 99, 112 [noting whether a person is in custody depends on the "circumstances surrounding the interrogation" and "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave" (fn. omitted)]; see also *Moore*, *supra*, 51 Cal.4th at p. 402, quoting *Oregon v. Mathiason* (1977) 429 U.S. 492, 495 [noting a *Miranda* advisement is not required merely because the person questioned is "'one whom the police suspect'" (italics omitted)].)

We further independently conclude defendant was *not* in custody when he accompanied Castillo to the police station for the interview. The record shows that defendant rode in the front seat of Castillo's car for the 20 or so miles to the police station; that defendant was neither searched before entering the car nor handcuffed during

27

the drive; and that as they drove, defendant and Castillo leisurely spoke about many subject matters none of which had anything to do with the homicide. (See *Moore*, *supra*, 51 Cal.4th at p. 397 [noting the fact police did not attempt to interview an individual while driving him to the station for an interview was a factor suggesting the individual was not in custody, when the record showed the individual was "at the least an equal partner in initiating and maintaining the conversation, which ranged widely in subject matter"].)

We reach the same conclusion regarding the *initial* stationhouse interview of defendant by Castillo and Avila. The record shows before defendant was placed in an interview room, Castillo asked defendant if he needed to use the bathroom and offered defendant something to drink and eat. The record further shows defendant was not handcuffed or otherwise restrained in the interview room.

Moreover, before any questioning of defendant began, the record shows that Castillo reminded defendant he was not being detained or arrested and that "[i]f at any moment [he didn't] want to speak with us [he could] leave." When defendant did not respond affirmatively to this statement, the record shows Castillo reiterated that defendant came to the station voluntarily and confirmed with defendant that he understood he was not being arrested or detained. Such circumstances support the finding defendant was not then in custody. (See *Aguilera*, *supra*, 51 Cal.App.4th at p. 1162 [informing a person he or she is free to terminate the interview and leave is a factor that suggests the person was not in custody]; see also *Moore*, *supra*, 51 Cal.4th at pp. 397-398 [noting the fact a person is taken to the police station for questioning was not

28

tantamount to being in custody when defendant was also told he was free to leave and would be taken home after questioning].)

The record shows Castillo in the beginning of the interview asked defendant a series of general questions, including where defendant lived and worked, the name of defendant's boss and how long he worked at the truck yard. The record shows that the detectives at this point in the interview were neither confrontational nor accusatory in their questioning of defendant.

As the interview progressed, Castillo asked defendant if he worked with the victim. Defendant denied working with or for the victim, admitted he knew the victim, and then volunteered that sometimes he played cards with the victim and they drank some "cold ones," but "that's it." The record shows Castillo's questioning of defendant became more probing and accusatory, including asking how defendant came into possession of the red Mustang and the victim's cell phone. Nonetheless, the record shows defendant did most of the talking, noting the victim was his best friend and repeatedly stating he was telling the truth even though police then were not accusing him of lying.

At some point during the interview, defendant asked Castillo "what happened, or why [the police were] asking" him about the victim or Rizo. The record shows after some more pointed questioning by Castillo in which he expressed skepticism with defendant's answers, Castillo for the first time told defendant the victim was dead. After defendant expressed surprise upon learning of the victim's death, Castillo stated he believed defendant's story but nonetheless asked defendant to take a polygraph test to verify this information. When defendant stated he had never heard of such a machine,

29

Castillo told defendant the machine used sensors to determine whether a person was telling the truth. Defendant agreed to take a polygraph.

While arranging for the polygraph, Castillo asked defendant if he was hungry or thirsty. Castillo even offered to go and buy defendant a "hamburger." In response to defendant's question, Castillo stated that the police had found the victim dead on Tuesday and that police were interviewing the victim's friends and eliminating them as suspects. Defendant responded he was "going to cooperate" with police. When defendant again suggested Rizo owed the victim rent money, Castillo informed defendant that they already had spoken with Rizo and that Rizo took the lie detector test and was eliminated as a suspect in the homicide. Castillo then told defendant after he took the test and verified he was telling the truth, they would move on in their investigation.

We need not decide whether defendant's interrogation was per se custodial when defendant agreed to take the polygraph test, although that issue appears to be one of first impression in this state. We note immediately before the polygraph test began the polygraph operator (i.e., Heard) told defendant he did not have to take the test and he was a "free man right *now*." (Italics added.) The record shows defendant in response said if he did not take the test, the police will "say [he's] lying."

In any event, it does not appear defendant made any statements of significance during the polygraph examination, and, thus, even if he was then in custody, any error in admitting such statements would be harmless beyond a reasonable doubt. (See *Moore*, *supra*, 51 Cal.4th at p. 404 [noting it was unnecessary to decide whether the interview became custodial after the police ignored the defendant's requests to end the stationhouse interview and drive the defendant home, as police had promised, because the defendant

30

"made no statements of any significance after that point," and thus any error in failing to suppress the last part of the defendant's interview was harmless under *Chapman*].)

However, *after* the polygraph test ended and Heard repeatedly and aggressively accused defendant of lying, we conclude a reasonable person in defendant's situation would have perceived he or she was not free to leave the station and was thus in custody. Indeed, as summarized *ante*, the record shows that when defendant insisted he was telling the truth immediately after the test concluded, Heard commanded defendant to "sit down," "listen" and stop saying he had nothing to do with the homicide because "that [didn't] slide" in light of the results of the polygraph test. At this point, we conclude defendant's interrogation turned custodial.[8]

---

[8]     It appears no published case in California has addressed the issue whether a defendant's failure to pass a polygraph test is a circumstance to be considered in determining whether a defendant who has not been formally arrested is in custody for *Miranda* purposes. We note other courts have addressed this exact issue and found a defendant was in custody and his or her statements should have been suppressed in violation of *Miranda* when police confronted the defendant with negative polygraph results during an interrogation. (See *Aguilera-Tovar v. State of Maryland* (Md.Ct.App. 2012) 57 A.3d 1084, 1091-1093 [noting the police's repeated and persistent statements to a defendant that he failed his polygraph test and thus had "lied" about the sexual abuse allegations was "one circumstance . . . that add[ed] substantial weight in favor of a finding of custody"]; *State v. Sampson* (Utah Ct.App. 1990) 808 P.2d 1100, 1105-1106 [reversing the defendant's second degree murder conviction because the inculpatory statements he made about his victim daughter without a full *Miranda* advisement resulted from an interrogation that went from "investigatory" to "accusatory" after police determined that the defendant had lied on a polygraph examination]; *State v. Godfrey* (N.J.Ct.App. 1974) 329 A.2d 75, 80 [noting it "cannot be seriously argued" that, after the police had administered a polygraph test and determined from the results of the test the defendant had lied to them and had been involved in a shooting, the police "would have permitted [the defendant] to walk from the inner office where he had been placed . . . out of the police station," and further noting that statements otherwise by police were "not worthy of belief"], affd. per curiam (1974) 67 N.J. 267; and *People v. Algien* (Colo. 1972) 501 P.2d 468, 471 [affirming the suppression of a defendant's statements after the defendant was informed the results of a polygraph test showed the defendant was

The record shows from there Heard stated that he was "not playing"; that defendant needed to "look at" Heard; that it was possible the victim's homicide was an "accident" and the victim and/or defendant got "angry," which led to the death; that defendant *had to tell* police the truth "because you [i.e., defendant] have a problem here"; and that the truth was still inside defendant's heart, but not on paper. Clearly, in light of the tone and tenor of the questioning, Heard was no longer interviewing defendant only as a potential witness. (See *Aguilera*, *supra*, 51 Cal.App.4th at p. 1164.)

As also summarized *ante*, the record further shows when defendant repeatedly insisted he was telling the truth, Heard in response repeatedly said, "No, no, no," told defendant he did not "want to he[ar] the same things" over and over and over again and demanded defendant stop saying he had nothing to do with the homicide and instead tell the truth about what happened to the victim. When defendant maintained he was being truthful, Heard next repeatedly stated "it's a lie," threatened to tell the detectives defendant failed the polygraph test and repeatedly told defendant the truth was missing and defendant had to tell the truth to help himself. Heard also repeatedly told defendant that Heard was "sure" defendant knew what had happened to the victim based on the results of the polygraph test. In light of Heard's repeated rejection of defendant's story, we conclude a reasonable person would realize that telling the "truth" as Heard and later, Castillo, insisted, meant admitting he or she was involved in or had knowledge of the homicide and that until the "truth" came out, he or she was not free to leave.

---

untruthful about setting a fire, and noting that "[u]nder such compelling circumstances, a reasonable person would with logic conclude that he [or she] could not leave the premises of his [or her] own free will but would be detained for formal arrest"].)

32

The record shows Castillo next joined Heard in the polygraph room and informed defendant that the polygraph test showed defendant was "hiding something" and that there were "different reasons [why] things happen," including "[i]f a person was defending himself, if a person was scared, if it was an argument and accidently you do something and someone was hit." When defendant again stated he was telling the truth, Castillo stated, "Something is wrong here. If [Heard] tells me that something is wrong here, something is not right here. And because of that we have to know the truth. Should you be scared? Yes, why not? I too would be, if the police came to speak with me, then I would have a little problem wouldn't I?"

After defendant reiterated he was telling the truth and was not scared, Castillo's questioning of defendant became even more confrontational. Castillo told defendant that they had spoken to 10 other people and that some of defendant's earlier answers were untrue. Castillo also told defendant that unless he told the truth, they would think the "worst" and they would conclude defendant had "planned" and had "wanted to" commit the homicide. When defendant still would not budge, Castillo tried a different approach, suggesting defendant loved people, that defendant's face showed remorse and that defendant merely committed an "error." Castillo reiterated that he "already kn[e]w" "[i]t was just an error."

At this point during the interrogation, defendant appeared to "give up" when he suggested that regardless of what he told police they were going to put him in jail. Castillo in response told defendant he was not detained, if defendant wanted to leave, he could leave and Castillo merely wanted the truth. After defendant reiterated the police were going to lock him up, Castillo stated: "And I am telling you Joel [i.e., defendant],

33

*the machine does not lie*. Something is missing here and you know that there is something missing, Joel. There is something missing *and we are going to talk about that. Let's go over here.*" (Italics added.)

Thus, although Castillo told defendant he could leave if he wanted to, we nonetheless conclude, based on the aggressive, confrontational and accusatory questioning of defendant by both Heard and Castillo, that a reasonable person in defendant's position would not believe he or she was free to leave the station. Indeed, the record shows that at this point defendant had been interrogated for several hours by the officers; that the police station was about 20 miles from defendant's work; that defendant had no means of getting home on his own if he had tried to leave before the officers were finished with him; that the officers knew defendant had lied to them about many important details involving the victim and the homicide, including how defendant came into possession of the victim's car and cell phone, when defendant had last seen the victim and when defendant had last been to the victim's apartment (where the defendant sometimes stayed); and that defendant had failed the polygraph test.

In light of this record, it cannot be seriously argued that police at that point in time would have permitted defendant to walk out of the police station. (See *United States v. Lee* (9th Cir. 1982) 699 F.2d 466, 467-468 [noting a defendant is still subject to custodial interrogation even when told he or she is free to leave and terminate a police interview when the totality of the circumstances, including the fact the defendant was questioned in a closed FBI car with two officers for well over an hour while police were inside the defendant's house, suggests to a reasonable person he or she was not free to leave].) We thus conclude a statement to that effect by Castillo, when considered in light of his other

34

statements to defendant, including insisting they were "going to talk about" the missing truth and demanding defendant "go over [there]" to talk, *and* when also considered in light of Heard's demand that defendant "sit down," "listen" and "look at" him after repeatedly accusing defendant of lying, is incredible, not worthy of belief and is not substantial evidence to support a finding defendant was not then in custody for purposes of *Miranda*.

But there's more. The record shows Castillo next moved defendant back into an interview room, and the two were again joined by Avila. At this point, defendant had been subjected to interrogation for hours. In addition, the trial court noted the video of the interrogation showed the detectives were sitting between defendant and the door when the interrogation resumed.

The record shows Castillo's questioning of defendant became even more confrontational and accusatory after the polygraph test, as Castillo systemically began to pick apart the story defendant had told them pre-polygraph. According to the trial court, Avila "two or three times" grabbed at the *Miranda* advisement attached to Castillo's hip, as Castillo began to describe in detail the information showing defendant was lying about many key facts regarding the victim and the homicide. Shortly thereafter, as Castillo continued to point out the myriad inconsistencies in defendant's story, Castillo finally said, "Listen, the questions that I am asking you, I already know the answer to. *I don't have you here just to have you here*." (Italics added.)

We conclude the tone of the questioning post-polygraph, the positioning of the officers in the interview room, the length of the interrogation and Castillo's admission that police already knew the answers to the questions they were asking defendant and that

35

they did not have defendant there "just to have [him] [t]here," further support our conclusion that defendant was then in custody for purposes of *Miranda*. A reasonable person in defendant's position would not then believe he or she was free to walk out of the police station.

In light of our conclusion that defendant's interrogation turned custodial when police informed him he had failed the polygraph test, we further conclude that at a minimum defendant then should have been given his *Miranda* advisement. As such, we independently conclude the trial court erred when it refused to suppress defendant's statements following the polygraph test, including his pre-*Miranda* admission that he went to the victim's apartment, they argued and they came to "blows."

The question then becomes whether the post-*Miranda* statements defendant made later that same night also should have been excluded. Guided by *Elstad*, we conclude the trial court also erred when it failed to suppress those statements.

In *Elstad*, an officer arrested the defendant for burglary at the defendant's home. The officer did not advise the defendant of his *Miranda* rights. In response to the officer's questioning, the suspect made brief, unwarned, incriminating statements. The defendant was then taken to a police station, given his *Miranda* rights, waived them and gave a more complete confession about 30 minutes after making his original inculpatory comments. (*Elstad*, *supra*, 470 U.S. at pp. 301–302.) The Supreme Court held that the officer's initial failure to administer a *Miranda* warning did not automatically taint the subsequent statements of defendant, which were made after he was given a proper advisement and after he voluntarily waived such rights.

36

In so holding, the court reasoned that, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with respect to a later statement obtained after a *Miranda* advisement. (*Elstad*, *supra*, 470 U.S. at p. 314.) Accordingly, the court concluded, "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. We find that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver. We hold today that a suspect who has once responded to unwarned yet *uncoercive* questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." (*Id.* at p. 318, italics added & fn. omitted.)

*Elstad* teaches the admissibility of a post-*Miranda* statement turns solely on the issue of "whether it is knowingly and voluntarily made." (*Elstad*, *supra*, 470 U.S. at p. 309.) "As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." (*Id.* at p. 318.) The court in *Elstad*

37

specifically declined to exclude the defendant's later statements as being the tainted "fruit" of the first non-*Mirandized* admission. (*Id.* at pp. 305–308; see *People v. San Nicolas* (2004) 34 Cal.4th 614, 639 [noting a "'subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement'"].)

Based on our independent review of the record, we conclude defendant's initial inculpatory statements, including he went over to the victim's apartment, they argued and they went to "blows," was the result of "deliberately coercive or improper tactics" by the officers, as amply demonstrated by the record in this case. (See *Elstad*, *supra*, 470 U.S. at p. 314.) In light of our conclusion and the fact Castillo and Avila continued questioning defendant immediately after they gave him a midstream *Miranda* warning, we further conclude defendant's post-*Miranda* statements were also involuntary and thus tainted because at that point, the "cat was out of the bag" as a result of the police coercion. As such, we independently conclude the trial court erred in failing to suppress the post-*Miranda* statements made by defendant at the police station.

That does not end our *Miranda* analysis, however. As noted, four days later Castillo questioned defendant in the courthouse immediately before defendant was arraigned. The record shows the trial court found Castillo was not required to readvise defendant of his *Miranda* rights because the court had found the stationhouse *Miranda* advisement given defendant four days earlier was "reasonably contemporaneous" with the continued custodial interrogation.

38

We need not decide whether the continued interrogation of defendant four *days* after the stationhouse interview was "reasonably contemporaneous" with a valid *Miranda* waiver because we conclude defendant's previous *Miranda* waiver was invalid, as it was not a knowing and intelligent waiver but was instead coerced by police. Because there was no prior valid waiver *and* because the record shows Castillo did not give defendant a new *Miranda* advisement *or* otherwise advise defendant of *Miranda*'s basic "strictures"[9] before questioning defendant at the courthouse, we independently conclude defendant's courthouse statements also should have been suppressed as the product or "fruit" of an unlawful custodial interrogation. (See *People v. Smith* (2007) 40 Cal.4th 483, 504 [noting the general rule that a "*Miranda* readvisement is not necessary before a custodial interrogation is resumed, *so long as* a proper warning has been given, and 'the subsequent interrogation is "reasonably contemporaneous" with the prior *knowing and intelligent waiver*'" (italics added)].)[10]

2. *The Error in Failing to Suppress Defendant's Statements Is Not Harmless*

We review a *Miranda* violation to determine whether the error was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.) "The beyond-a-

---

[9]    *Miranda* requires that a defendant taken in custody be warned of the right to remain silent, that anything said could be used against the defendant in a court of law, that the defendant has the right to have an attorney present and that if the defendant cannot afford an attorney, one would be appointed prior to questioning. We note that "no talismanic incantation" is required to satisfy *Miranda.* (See *California v. Prysock* (1981) 453 U.S. 355, 359 [noting there is no "desirable rigidity in the *form* of the required [*Miranda*] warnings"].) As summarized *ante*, Castillo did not inform defendant of any of these rights before he continued questioning defendant at the courthouse.

[10]    In light of our decision, we need not address whether the police purposely engaged in a two-step interview procedure made unlawful in *Missouri v. Seibert* (2004) 542 U.S. 600 when the police gave defendant a midstream *Miranda* warning at the police station.

39

reasonable-doubt standard of *Chapman* 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (*People v. Neal* (2003) 31 Cal.4th 63, 86.) We conclude the People have not satisfied this burden.

Indeed, the record shows in closing argument the prosecutor, after telling the jury "[g]ood morning," made the following statement: "Words and actions," and then followed that statement up by telling the jury that "[e]verything you need to know about the murder of Jesus Trejo on January 14th, 2011 are found in the *words* and in the actions of the defendant." (Italics added.) The record further shows the prosecutor repeated the phrases "*words* and actions" (italics added), in defendant's "'own *words*'" (italics added), and defendant "lied" to police during the stationhouse interview, throughout closing argument as the prosecutor argued in painstaking detail the information and/or statements defendant provided the police during his stationhouse and courthouse interviews proved guilt, statements that we have now independently determined violated *Miranda*. (See *People v. Haydel* (1974) 12 Cal.3d 190, 202 [noting the prosecutor's reliance on evidence made inadmissible because of an involuntary confession was not harmless error, when the record showed "that evidence was a prominent part of the prosecution's case, and the introduction of that evidence occupied a substantial portion of the trial"].)

Although the jury heard that defendant was in possession of the victim's car and cell phone and that defendant sometimes stayed at the victim's apartment, we cannot say on this record that the guilty verdict of defendant was "surely unattributable to the error"

in admitting the coerced statements of defendant in violation of *Miranda.* (See *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)[11]

## DISPOSITION

The judgment of conviction is reversed. The matter is remanded to the trial court with directions to vacate its order denying defendant's motion to suppress and to issue a new order granting that motion.

BENKE, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

---

[11] In light of our conclusion, we deem it unnecessary to reach defendant's alternate contention that he was denied his constitutional right to have 12 sitting jurors.